UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Criminal No: 21-cr-10001-NMG |
| v. | ) | |
| | ) | ***LEAVE TO FILE EXCESS PAGES*** |
| NEAL GRUBERT, | ) | ***& TO FILE REDACTED MEMO &*** |
| Defendant. | ) | ***EXHIBITS UNDER SEAL REQUESTED*** |
| | ) | ***ON 3/28/22*** |

## MOTION TO SUPPRESS STATEMENTS OBTAINED FROM DEFENDANT BY GOVERNMENT AGENTS ON JULY 2, 2020 AND JULY 3, 2020

Defendant Neal Grubert respectfully moves this Court to suppress statements obtained from him by government agents on July 2, 2020 and July 3, 2020 in violation of his rights under the Fifth Amendment. As grounds, he states that the agents failed to scrupulously honor his invocation of his right to remain silent under *Miranda v. Arizona*, 469 U.S. 91, 98-99 (1984). *Michigan v. Mosley*, 423 U.S. 96, 103-104 (1975).

## Background

At approximately 10:22 pm on July 2, 2020, law enforcement executed a federal search warrant at defendant Neal Grubert's home at 1100 County Road 258 in Bertram, Texas. *See* Exhibit 1, Report of Investigation 006, pg. 2 ("Report __.").[1] The warrant was sought after an investigation by ██████ law enforcement led Homeland Security Investigation ("HSI") agents to believe that Mr. Grubert had been communicating with a ██████ citizen who produced and distributed images and videos of the ██████ citizen sexually abusing the citizen's three-year-old

---

[1] Exhibit 1 is a 10-page Department of Homeland Security report of the interrogation of Mr. Grubert by agents. It contains several redactions, none of which were created by undersigned counsel. The copy of the report contained in Exhibit 1 is in the same form provided to counsel by the government in discovery.

niece. (Report 1). They also believed that Mr. Grubert had sent the ███████ citizen videos of himself masturbating to the images and videos. (Report 1).

Agents entered Mr. Grubert's home forcibly, without knocking. *See* Exhibit 2a and 2b,[2] Recorded Interview 5-6 ("Interview _."); Exhibit 3, Detention Hearing Transcript 15-16 ("Hearing Transcript _."). They broke down his door, and broke glass. (Interview 7, 25). They deployed flashbang grenades into his home. *Id.* at 117, 132-33. Mr. Grubert was brought to the floor and handcuffed. *Id.* at 3, 12-13, 26, 27, 85.  A total of fifteen agents participated in the execution of the search warrant.[3]

After the forced entry and handcuffing, agents secured Mr. Grubert in the back of a police vehicle for an hour. (Report 2). He remained there until HSI Agents Greg Squire and Caitlin Moynihan brought him back inside the residence, Mirandized him, and conducted an interview. *Id*. The handcuffs were removed at some point. (Interview 27). Grubert was not fully dressed during the interview. *Id.* at 136, 140. The interview lasted 2 hours and 15 minutes. Exhibit 2a. It was audio-recorded, without video. The damage done to the rental home was so extensive that it could not be rented after the entry. (Hearing Transcript 46-47). When Mr. Grubert asked about all the damage, HSI Agents Squire and Moynihan said it would be dealt with through a tort claim and they would talk to his family about it. (Interview 139-140). At the end of the interview, before he was removed from the premises, Mr. Grubert requested that the home be boarded up. *Id.* at 140.

---

[2] Exhibits 2a and 2b, filed under seal, are the m4a recording file of the defendant's interview and the transcript of the recording, respectively. For ease of reference, the excerpted portions cited throughout this report refer to Exhibit 2b, the transcript of the interview, by page number.

[3] In a March 24, 2022 response to defense discovery requests, the government informed undersigned counsel that a total of 15 agents were present during the execution of the search warrant (12 Texas Homeland Security agents, and 3 Boston Homeland Security agents).

Once Mr. Grubert had been brought from the police vehicle into the residence, and immediately after telling Mr. Grubert that he would give him a copy of the search warrant and giving him *Miranda* warnings, Agent Squire said that the agents would like to carry on and have a conversation with him there. *Id.* at 1-2. Mr. Grubert asked if his cat could be put into a room behind a door because it had never been outside. *Id.* at 2. Agent Squire asked Agent Moynihan to sit with Mr. Grubert while Squire tended to the cat. *Id.* at 2-3.

Squire said to Grubert:

Um, okay, so like I said, um, search warrant, obviously. Uh, we are here from Boston, because this is our investigation that led us here tonight. Um, and I probably won't, you know... I'm not gonna fluff anything for you, and if it can be reciprocal, that would be great for me, okay? Certain things in your life and your wife's life will not be the same moving forward from today, okay? Because there's certain things that we already know. Again, I'm not gonna BS you through that stuff. And then there's things that we would like to know, okay? Um, and that's -- those are kind of the facts. And we do these interviews all over the country and all over the world. That's what our little special team in Boston does.

*Id.* at 4-5.

Squire acknowledged damage that had been done to the residence upon entry and during the search: "We're not here to disrespect your home. I understand the damage. Your wife is not aware of what's going on right now obviously, and I have no interest in embarrassing you, um, or anything that's happened." *Id.* at 5.

Grubert provided answers to Squire's questions about his and his wife's work and family members and their locations. *Id.* at 7-10. Squire asked Grubert if his wife was pregnant, and Grubert told him that she was 12 weeks pregnant and had lost two pregnancies recently. *Id.* at 10. Squire commented that was brutal and asked whether it was hard on his wife. *Id.* Grubert told Squire that his wife was off her depression medications and any cramp, or any pain would cause her to be instantly in tears and worried she would lose the baby. *Id.* He said that he was sure his

wife, who was at work at the time and would be leaving there at midnight, was going to come home and die. *Id.* at 11.

Grubert said he was in shock because he had never been in handcuffs before. *Id.* at 12-13. He answered questions about computers in the home and told the agents that he was a computer guy who had both gone to college for computer science technology for two years and was self-taught.  He majored in programming and art for video development but had a particular interest in hardware and forensics.  *Id.* at 14-20. Agent Squire told Grubert that there were three computer forensics people with him, that people in the Agency went through similar training, and asked Grubert about his familiarity and preferences for forensics tools. *Id.* at 20-21. Grubert answered, listing a number of tools, and said that they would find a lot of them. *Id.* at 22. After speaking about his familiarity with computers and forensic tools, Squire and Grubert had the following interchange:

> SQUIRE: And you know where there's holes and where there's not holes, um, and where holes can be created, all that stuff. Um, so, obviously, we're here, um, and, you know, we're looking to talk to you -- and, and all -- and in -- with 100 percent honesty, some help from you. Um, that, that is one thing that we'll be asking for, um, and the help is gonna behoove you, and that's -- I guess you can listen to it like it's TV or not, um, but I, I don't have a -- I don't have a gain in telling you anything other than that -- what the truth is, okay? Um, we are dark web, uh, kind of an expert group. We work with several law enforcement agencies across the world. There's probably, honestly, only 20 of us that do this specific work, um, and we target dark web child exploitation websites, okay? So that's, that's the reason we're here. Um, and it's... It's a little bit of a pill to swallow, I think, and, and, you know, I know where you are normally. I know who you are. Um, and I -- I'll, I'll be honest: I do respect who you are, uh, but at the same time we need to cover how you got there, who you know, who might be in trouble, okay? And I'll, I'll be -- I'll sh-- I'll tell you about the tiers of how this works and how our team works: our number one concern is always, always the safety of a child, okay?
> GRUBERT: Agreed.
> SQUIRE: So when -- and, and I know that you know that, and I know that you respect that, and I know that you don't like hurtcore, and I know that you don't enjoy pain and all that other shit that goes on on other sites, okay? Um... So when we do interviews like this, and we do search warrants like this, and, you know, uh, aside from some of the, uh, glass that's broken –

*Id.* at 24-25.

Squire then said that he would like to discuss more about the dark web and explained again that at the front of their concerns was the safety of children, and noted that Grubert agreed with that, and was sure Grubert would agree with him anytime moving forward. *Id.* at 27. He told Grubert they were confident that there was no active abuse of a child here, and asked Grubert to tell him otherwise if that is not the case. *Id.* at 27-28). He implied that they had taken off the handcuffs only because they were confident that there was no active abuse. *Id.* at 27. Grubert told him that there were no children here and he had never laid hands on a child. *Id.* at 28). ███

███████████████████████████████████████████████████████████████

███████████████████████████████████████████

Grubert said that Squire likely knew that Grubert used Tor and told him that he had been using Tor from the age of 12, was a big proponent of it, and had only seen anything that was on it. *Id.* at 30.  Squire responded that he already said that he knew what Grubert's activity is, so he wanted Grubert to be candid about what he did on Tor. *Id.* at 30.  Grubert said he used Tor and went on dark web sites mainly to talk programming. He wanted to build a website that could work with Tor. He had seen, in passing, sites and lists that included child pornography on Tor, and was pretty sure he had contact with people who were involved, but he didn't ask. Squire asked about encryption and Grubert told him he encrypted everything. Squire asked if there where images or videos to be concerned about and Grubert said there were none. *Id.* at 30-36.

Squire then asked Grubert for passwords to accelerate the forensic exam of his electronics. *Id.* at 36. Grubert said "I don't give out passwords" and "I am not givin' out no passwords." *Id.* at 36-37. Squire immediately pressed Grubert:

SQUIRE: But there's nothing --

GRUBERT: No, sir.
SQUIRE: There's nothin' to be worried about, but you're not givin' up your passwords.
GRUBERT: No passwords.
SQUIRE: W-- can I ask why?
GRUBERT: Uh, I mean, you, you can, but, I mean, I just don't trust passwords to be out like that. I'm not...
SQUIRE: But if -- sorry, so, you're confusing me.
GRUBERT: I'm, I'm --
SQUIRE: There's nothing to be concerned about, but you don't trust passwords?

*Id.* at 37.   After a discussion in which Grubert talked about his belief in the importance of encryption and the use of Tor, Squire pressed forward and asked, "So how do I believe that there's nothing if you won't provide the passwords?" *Id.* at 38.   Grubert stated that he had nothing, there were encrypted drives, he never made any secret of the fact that he used Tor, and he talked to his friends about it, and he encrypted things just because what was his was his to own. *Id.* at 38-39.

Squire pressed on, said that Grubert was not telling the truth, asked if he was familiar with ▇▇▇▇▇▇▇, and Grubert said he had seen it. Squire asked if Grubert had an account on it and Grubert said no. *Id.* at 39-40. Squire said he knew Grubert was not telling the truth now, and using Tor and encryption is different than using encryption to protect criminal activity. *Id.* at 40.   Grubert said:

GRUBERT: -- uh, just bein' honest, really what I want to do is I don't want to be sitting at this table at all.
SQUIRE: Yeah, no.
GRUBERT: I just want to be quiet. I have almost nothing to say. Everything that, that we can talk about -- we can talk about the, you know, the, the little stuff, the -- you know, shootin' the breeze, what we believe about with computing --
SQUIRE: Mm-hmm.
GRUBERT: -- but beyond that, y'all aren't my friends.
SQUIRE: True, yeah.
GRUBERT: Y'all are actually adversarially here. Y'all have broken in my doors. You know, I'm... I mean, uh -- yeah, here I am, si-- sh-- sitting at this table, sharing water with you guys. Nothing against you. Nothing.
SQUIRE: Right.
GRUBERT: But you're still my enemy.
SQUIRE: So... I don't --

> GRUBERT: That's just (overlapping dialogue; inaudible) --
> SQUIRE: -- I don't know how -- I don't know how your --
> GRUBERT: -- from, from this.
> SQUIRE: -- I don't know how we're enemies, per se --
> GRUBERT: (laughs)
> SQUIRE: -- um, a-and, and --
> GRUBERT: Well, adversarial, at least.

*Id.* at 40-41. Squire pressed further, telling Grubert that Squire was being forthright and that he knew quite a bit about what had happened here because he had seen things through companies from other arrests that occur around the world. *Id.* at 43. Squire said that Grubert's part in Squire's enforcement of the law would not be a detriment to Grubert, would not be deep dark secrets, and would not be an attempt to embarrass Grubert in front of his wife. *Id.* at 43-44. He wished Grubert a happy birthday, as it was his birthday, and told him that one of the big things for Grubert was to get over the hump as a 31- or 32-year-old man is accepting responsibility for what happened. *Id.* at 45. Grubert re-iterated that he did not wish to speak:

> GRUBERT: -- things that you know, and that's fine. Um, you know, we, we both know what I have things that I, uh, tell any of my friends. I don't hide the fact that I use the dark web. I use Tor. I use, you know, all these forensics tools and all this stuff. I, I like it. This is -- it's a hobby.
> SQUIRE: It's your right, yeah.
> GRUBERT: Okay? So the thing is is that I know that you guys are here as an adversary to, to say this is, this is what we believe happened, this is what we did, uh, this is, you know, how we found out XYZ information. And, as far as I'm concerned, I still haven't seen the inside of a courtroom. I still have seen no judge. I'm still just as innocent as both of you. So until I... Really, the, the thing is, is, I mean, I d-- I don't -- I'm not gonna say much more than what I would say to my friend down the street than that. I have nothing else. That's all I have.
> SQUIRE: Well, you're -- no, you're choosing not to say anything else.
> GRUBERT: No, I -- I'm telling you --
> SQUIRE: N-no, you, you --
> GRUBERT: -- exactly --
> SQUIRE: No, you, you are choosing, because --
> GRUBERT: I'm telling you exactly. If, if you were the neighbor kid down the street.

*Id.* at 46.

Squire said that he understood that Grubert wouldn't tell anyone, any neighbor, any friend, about his activity on the dark web, that Squire knew what the activity was, that it was difficult for Grubert to look at him and think that Squire knows, and he was asking him to accept where they were. *Id.* at 47.  Squire said that Grubert didn't understand that Grubert had valuable information or intelligence for them. *Id.* at 50. Grubert asked whether this was the time and place to be talking about it. *Id.* at 51. Squire said that when attorneys get involved, conversations become less structured, and information that Grubert had would be much more valuable right now. *Id.* at 54. Grubert told Squire that he had already been fighting depression, and that to the extent that he had been thinking while sitting in the squad car that it would have been better to simply start shooting when he was in the house and had dealt with suicide. *Id.* at 56-57.

Grubert then said, "We are definitely welcome to have more conversations in the future." *Id.* at 57. Squire commented that Grubert only saw darkness now, and Grubert talked about concern for his wife and losing family. Squire said there would be a different opportunity should Grubert not wait until later to talk, or only when an attorney was involved, and encouraged him to speak to agents now because he might make a difference in a child's life. *Id.* at 59.

Grubert responded that was a hard pill to swallow because as Squire knows Grubert did not want any kid to come to harm. *Id.* at 59. Squire told Grubert that he didn't want Grubert to just claim he knew things he did not know. Grubert said he just wanted out of this. *Id*. Squire again said that he believed Grubert didn't want to see a child harmed, his family did not want to see a child harmed, and 98% of the population does not agree with people hurting children. *Id.* at 60. He said that Grubert could effect a change and it would be on his conscience whether he wanted to do it or not, and that at some point they would not be able to talk. *Id.* at 61. He further pressed Grubert to talk:

GRUBERT: I am still innocent over here. S--

SQUIRE: What I -- what I'm telling you is that I'm not – no one's taking those liberties from you. We're here because a crime occurred here. That's why.

GRUBERT: Mm-hmm.

SQUIRE: Okay? And --

GRUBERT: I haven't seen it.

SQUIRE: -- and, and... It's, it's, it's -- uh, you have the absolute right to say that for -- until you're blue in the face, until your wife gets home. However long you want to say it is fine. What I'm tryin' to ask you is you can effect the change, you can -- you can stop a child from bein' abused. I'm positive of that. Whether you choose to do it tonight is sort of -- that -- that's, that's your decision. And so when you close your eyes tonight, or you say goodbye to your wife --

GRUBERT: Yeah, I close --

SQUIRE: -- or you say --

GRUBERT: I say goodbye to my wife and close my eyes, probably in a concrete holding cell somewhere, in some hole (laughs) --

SQUIRE: Minimize it or laugh about it if you want, but you can make a difference. You know you can. And, and that's what I'm askin'. And, and, and you can't -- well, here's the thing, right?

GRUBERT: I have nothing.

SQUIRE: You can't change anything that's happened, right? Nothing that's happened in your past can be changed right now. Nothing I say, nothing Agent Moynihan said, nothing anyone says can change what's already occurred. Okay? What you can control, what you can change is what happens after tonight. So you can not help, or you can help. And you're not a monster. You're not a hurtcore guy. You're not -- you don't advocate that behavior with people. I know you don't. So what do you advocate at this point? Like, how do -- what, what is your sort of legacy moving forward Like, how are you starting this next chapter? Because a new chapter's startin'. There's no question about it. You know that, and you're focused on the dark stuff and all that other stuff, but when you say to your family, you say one thing, you say another, like, how does that start for you? How does the next step start for you? Does it start where you're a stalwart, you know, "I'm not gonna give up encryption; I have no idea what you're talkin' about," or is it "I'm going to accept some of what I've done, and some of what everybody at the table knows, and I'm gonna have a positive effect on, o-on a, a little boy, little girl's life"?

*Id.* at 63-64.

Squire told Grubert he could go to the prosecutor and say what they had accomplished. He again appealed to saving a child, and that Grubert would have to know what torment the kids experience. *Id.* at 66. Grubert said that it had happened to him, and Squires responded then that he should know how terrible it is, and that he could make a difference. *Id.* Grubert again stated that

he didn't want to say anything, and affirmed that he chose that, and there were times to move on and make changes. *Id.* at 66-67. He said that he had no one, and one of the few friends he had was now lost because he had been there the night the search warrant was executed. *Id.* at 67.



After further discussion of how Squire could go to the prosecutor and Grubert could save children, Grubert stated that whatever came out of his mouth at the table would be ammo against him. *Id.* at 74. Squire said "No." *Id.* at 74. He asked how it could play out badly if Grubert helped somebody. *Id.* at 74-75. Grubert again said everything he said would be put in front of a judge. *Id.* at 76. Squire talked about providing assistance, appealing to Grubert's moral compass, and said that if Grubert was callous enough not to care about that, that was fine. *Id.* at 77.

Grubert said the only way to make this as best as possible would be for him to just stay quiet. *Id.* at 78. He again stated that anything could be used against him. *Id.* Squire told Grubert that it wasn't Squire's fault that Squire was there; Squire didn't commit the crime." *Id.* at 80-81. Squire again talked about cooperation and how Grubert could make a difference:

> SQUIRE: -- and cooperation, whether they talk about it on the internet or not, is a big deal. It is a big factor. I've had dozens of people that just go, "Pfft, I'm not sayin' shit." That's their prerogative. And a lot of those guys, maybe they were hands-on, maybe they like abuse. I mean, you've read a lot of the same shit I have. In 15 years of doin' this, there's still some days where I read stuff and I'm like, I gotta breathe for a second here, 'cause that's just fuckin' over the top.
> GRUBERT: With you.
> SQUIRE: Yeah. So I can ha--

GRUBERT: I've been with you since I was 13.

SQUIRE: Yeah, so, so we can have -- we can have a change. Uh, we have -- uh, no, our job is to make a difference, right? Our job is to effect that change. Um, and for us -- I mean, for me, at this point in my career, having seen all kinds of shit, um, I value the opportunity to, you know, make, make a bigger effect on somebody, or have a better effect on somebody that can help us […] I wanna make a bigger difference. I wanna find a kid who's being brutally abused by somebody. And I know that I can do that job easier with your help. I know that. And I would -- I -- we blow off people all the time 'cause I'm like, fuck you, you're not gonna help me, 'cause you're, you're a nobody. But you're not a nobody. You're a f-- you're a somebody.

*Id.* at 82-84.

Shortly thereafter, Grubert said that if Squire truly thought there was something Grubert knew that Squire had to know now to save a kid, Grubert would save the kid. *Id.* at 88. Squire talked about doing an account takeover and Grubert said that it was not possible:

Um, there are handshakes. Um, there is a lot that I can't necessarily give you, um, on top of what's already -- would be gone, you know, as far as my programming stuff goes. What's already gone is gone. But also, I can't say much to you. I have to be vague and quiet and -- you know, because I'm an innocent man standing here. And the more that I talk to you, the more that kind of ticks down. And, like I s-- told you, I wanna make a difference in a kid's life –

*Id.* at 94-95.



Grubert said that the issue he saw was that this would all go in front of a judge who would say "Fuck you." *Id.* at 97-98. Squire said that the judge wouldn't. *Id.* at 98. ▮▮▮▮▮▮▮

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████ Squire said he could see Grubert's face and room and green lamp and there was a GPS that comes back to the house. *Id.* at 98-99. Grubert said that he knew he was probably screwed if they could identify a lamp. *Id.* at 100. Grubert said that he got the videos from the internet. *Id.* at 102. ██████████████████████████████

Squire told him that they got their information through Signal, and Grubert said "I knew it." *Id.* He said that he used Signal. Squire said those videos provided the means to come to Grubert's home and Grubert responded "Yeah." *Id.* at 105. He said that what Squire had found is the only person Grubert has ever trusted, and said he was a friend. *Id.* at 108-109. Grubert said "I know you have my rite of passage" *Id.* at 111. ████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████

> GRUBERT: -- okay, is that we have this all important timeline, okay? I-- y'all say y'all have enough evidence, you know, to have my dead to rights. I get that. I respect it. You know, I, I think we can all move on. We can get this in front of a judge.
> SQUIRE: Yep.
> GRUBERT: Um, we can deal. And just between me and you, as, as someone -- what was your name again?
> SQUIRE: Greg.
> GRUBERT: Greg.
> SQUIRE: Yeah.
> GRUBERT: Okay, so, between me and you, please, by all means, if you have a business card even, leave it with me, because when this comes down to a point where judgment has been decided, all of -- anything that I know will be just as fresh and good now as then.

*Id.* at 118-19.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████ He later re-iterated that he would be willing to speak with Squire at a later date:

> GRUBERT: But... I mean, by all means, if you really think -- you know, and, I mean, you know, I want my day in court. I don't want to say anything here now that is going to undermine any chance. I want to be able to talk to legal counsel --
> SQUIRE: Sure.
> GRUBERT: -- get some info from them.
> SQUIRE: Yep, a hundred percent.
> GRUBERT: But with how y'all knocked, you did destroy what you wanted.
> SQUIRE: Gotcha.
> GRUBERT: There were probably other chances, but, you know, if we want to talk about that, I would even actually be willing to discuss stuff like that with you personally –
> SQUIRE: Hmm.
> GRUBERT: -- just you --
> SQUIRE: Fair.
> GRUBERT: -- when the hammer falls, and when it's, you know --
> SQUIRE: There'll be --
> GRUBERT: -- life behind bars. (laughter)

*Id.* at 128-29.

## Argument

I. **Mr. Grubert Invoked His Fifth Amendment Right to Remain Silent and the Law Enforcement Officers Failed to "Scrupulously Honor" the Exercise of that Right.**

a. Introduction

The Fifth Amendment to the United States Constitution provides: "[n]o person . . . shall be compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend. V. To protect this constitutional right against self-incrimination, *Miranda v. Arizona* established certain "procedural safeguards" that officers must comply with to subject a suspect to custodial

interrogation. 384 U.S. 436, 478-79 (1966). Suspects must first be informed of their "right to remain silent" and their "right to the presence of an attorney." *Id.* at 444. If a suspect "indicates *in any manner, at any time prior to or during questioning*, that he wishes to remain silent, the interrogation *must cease*." *Id.* at 473-74 (emphases added). If a suspect "states that he wants an attorney, the interrogation must cease until an attorney is present." *Id.* at 474.  By invoking either the right to remain silent or the right to counsel, a suspect has the "right to cut off questioning" and officers must cease questioning the suspect. *Id.*

To invoke the right to remain silent or the right to counsel and thereby cut off questioning, the suspect's invocation must be "unambiguous." *Berghuis v. Thompkins*, 560 U.S. 370, 381-82 (2010) (request to remain silent); *Davis v. United States*, 512 U.S. 452, 459 (1994) (request for counsel). An invocation is unambiguous when a "reasonable police officer under the circumstances would have understood" the suspect intended to invoke his Fifth Amendment rights. *Tice v. Johnson*, 647 F.3d 87, 107 (4th Cir. 2011); *Davis*, 512 U.S. at 459.  No specific form of words is required; "a suspect need not speak with the discrimination of an Oxford don" to invoke his Fifth Amendment rights. *Davis*, 512 U.S. at 459; *see also Emspak v. United States*, 349 U.S. 190, 194 (1955) (explaining that "no ritualistic formula or talismanic phrase is essential in order to invoke" Fifth Amendment rights). This objective inquiry "'avoids difficulties of proof and . . . provide[s] guidance to officers' on how to proceed in the face of ambiguity." *Thompkins*, 560 U.S. at 381-82 (citing *Davis*, 512 U.S. at 458-59).

A suspect is able to selectively invoke Miranda rights regarding some subjects but waive rights regarding others. "Through the exercise of his option to terminate questioning [a suspect] can control *the time at which questioning occurs, the subjects discussed*, and the duration of the interrogation. *Michigan v. Mosley*, 423 U.S. 96, 103–04 (1975) (emphasis added). "The

requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting." *Id.* at 104.   Once invoked, the government cannot use subsequent statements to agents to "cast retrospective doubt on the clarity of the initial request itself."  *Smith v. Illinois*, 469 U.S. 91, 98-99 (1984).

After a suspect has invoked the right to remain silent, multiple factors are relevant to determining whether resumption of questioning is permissible and the suspect's right to cut off questioning was "scrupulously honored." *Mosley*, 423 U.S. at 103–04.  These include whether a reasonable period of time passed prior to the resumption, whether the same officer resumed questioning, whether the suspect received refreshed *Miranda* warnings, and whether questioning concerned the same alleged crime. *United States v. Oquendo-Rivas*, 750 F.3d 12, 17-18 (1st Cir. 2014). The intensity with which the government pursued questioning after the suspect asserted the right to silence factors into the question, as well as whether the government or the suspect initiates communications after invoking his rights. *United States v. Barone*, 968 F.2d 1378, 1384 (1st Cir. 1992); *United States v. Thongsophaporn*, 503 F.3d 51, 57 (1st Cir. 2007). Any re-initiation of the interrogation by the suspect will serve to make subsequent questioning permissible "'only where law enforcement has complied with its obligation under *Miranda* to scrupulously honor the defendant's right to remain silent.'" *United States v. McIntosh-Figueroa*, No. 19-00157, 2021 U.S. Dist. LEXIS 5152  at *15, 2021 WL 112148 (D.ME January 12, 2021) quoting *United States v. Lara Lara*, 440 F.Supp. 3d 64, 71 (D. Mass. 2020) and citing *Barone*, 968 F.2d at 1384 (after suspect said he did not want to answer questions, his right to remain silent was not scrupulously honored even though he asked agents "what do you want?" where suspect was responding to agents who did not simply allow him to remain silent, and exhorted him to tell the truth).

For the purposes of whether invocation of the right to silence has been scrupulously honored, government actions include both "express questioning or its functional equivalent," that is, "words or actions . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Thongsophaporn*, 503 F.3d at 57 *citing Rhode Island v. Innis,* 446 U.S. 291, 300-01, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980). Because "repeated rounds of questioning" in the face of a decision to remain silent nearly always will undermine a suspect's will, a Fifth Amendment violation is *presumed* absent a showing that police scrupulously honored the right to cut off questioning. *Barone*, 968 F.2d at 1383, quoting *Mosley*, 423 U.S. at 102.

b.   Mr. Grubert was subjected to custodial interrogation

The "ultimate inquiry" when determining whether a defendant was in custody during an interrogation "is simply whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322 (1994). The determination is made by considering the totality of the circumstances and asking whether in light of the circumstances of the interrogation, "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave," *United States v. Mittel-Carey*, 493 F.3d 36, 39 (1st Cir. 2007) *quoting Thompson v. Keohane*, 516 U.S. 99, 112 (1995).

The First Circuit has identified four non-exhaustive factors to consider when custody is at issue, including whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation. *Mittel-Carey*, 493 F.3d at 39. Whereas interrogation at a residence can weigh against a finding of custody, the level of physical control exercised over a suspect during a search and interrogation can weigh heavily in the opposite direction and carry the most weight. *Id*. at 39-40.

The level of physical control exercised over Mr. Grubert during the search and interrogation and the character and duration of the interrogation demonstrates that no reasonable person would have felt that he was at liberty to terminate the interrogation and leave. Agents forcibly entered Mr. Grubert's home without knocking at approximately 10:22 pm. They broke down his door, broke glass, and caused enough damage to his home that it needed to be boarded up and became uninhabitable. They deployed flashbang grenades into his home. Mr. Grubert was brought to the floor and handcuffed. A total of fifteen officers participated in the execution of the search warrant.

After the forced entry and handcuffing, agents secured him in the back of a police vehicle for an hour.  He remained there until HSI Agents Greg Squire and Caitlin Moynihan brought him back inside the residence, Mirandized him, and began questioning him. While the handcuffs were eventually removed, the agents maintained strict control over Grubert. He was immediately told that the agents were there from Boston because their investigation led them there and that "Certain things in your life and your wife's life will not be the same moving forward from today, okay? Because there's certain things that we already know."  Because of the broken door and glass, Mr. Grubert asked if his cat could be put into a room behind a door because it had never been outside. Agent Squire asked Agent Moynihan to sit next to Mr. Grubert while Squire tended to the cat. During questioning, Squire encouraged Grubert to stop a child from being abused before he said goodbye to his wife that night. Interview 63.

Grubert was by himself at the time of the search and interrogation because the agents conducted the search at a time that they knew his wife was at work. They let him know that they knew this. *Id.* at 80. When Grubert repeatedly said that his wife had arrived back outside the home, the agents continued to question him rather than permit him to speak with her until they were

finished with the interrogation. *Id.* at 87, 95, 131. At the time of the forced entry, Grubert had a friend visiting in his home, but was given no contact with him after law enforcement entered. *Id.* at 16, 33. Grubert was not fully dressed during the interview. *Id.* at 136, 140. When he was permitted to speak with his wife, he was told what clothes to wear, and agents went into the bedroom to retrieve the clothes. *Id.* at 136-37. The interview lasted 2 hours and 15 minutes. *See* Ex. 2a. He was never told that he was free to leave.

Mr. Grubert was in custody during his questioning because no reasonable person would believe in the circumstances that he was at liberty to terminate the interrogation and leave. *See Mittel-Carey*, 493 F.3d at 40 (suspect in custody where, because he was awakened in his own home by law enforcement officers, one of whom had an unholstered gun, eight officers were present in his home, and he was not permitted freedom of movement or contact with girlfriend in his own home, he would not believe that he was at liberty to terminate ninety-minute to two-hour interrogation and leave).

    c.  <u>Mr. Grubert clearly invoked his right to remain silent</u>.

During the interview Mr. Grubert repeatedly and clearly asserted his right to remain silent. He told the agents that he would not provide them with information concerning how his account could be accessed, that he would not speak to them about anything aside from computing in general, and he would only talk to them about anything else once he had been to court. After Squire asked about accessing Grubert's computers and accounts, Grubert said "I don't give out passwords" and "I am not givin' out no passwords." Interview 36-37. After Squire said that there was a difference between using Tor and encryption and using encryption to protect criminal activity, Grubert said he just wanted to be quiet, had almost nothing to say except shooting the breeze and talking about general computing, and he stated that they were adversaries. *Id.* at 40-41.

He later re-iterated that he wouldn't say any more to the agents, saying that he wouldn't say any more than he would to a friend down the street, that the agents were adversaries, that he had not seen the inside of a courtroom or a judge. *Id.* at 46. Squire said he understood Grubert wouldn't tell any neighbor or friend about his activity on the dark web. *Id.* at 47. After pressing by Squire, Grubert said they were welcome to have conversations in the future. *Id.* at 57. He again stated that he didn't want to say anything, and affirmed that he chose that, and there were times to move on and make changes. *Id.* at 66-67. Grubert said that whatever came out of his mouth at the table would be ammunition against him. *Id.* at 74. He said it was best for him to stay quiet, and anything could be used against him. *Id.* at 78. Twice again, Grubert said he would speak to Squire, but only at a later date, after a judgment or a day in court, or speaking with counsel. *Id.* at 118-119; 128-29.

These were clear invocations of his right to silence. *See United States v. Reid*, 211 F. Supp. 2d 366, 374 (D. Mass. 2002) ("As the Supreme Court noted in *Davis* with respect to the right to counsel, 'a suspect need not speak with the discrimination of an Oxford don' in order to invoke the right. 512 U.S. at 459, 114 S.Ct. 2350 (internal quotation marks omitted). A suspect's right to silence does not depend upon the use of particular, talismanic words which trigger the protection that the right affords. *United States v. Ramirez,* 79 F.3d 298, 304 (2d Cir.1996)"). A statement is unambiguous if a reasonable police officer in the circumstances would understand the statement to be an invocation of the right to remain silent. *United States v. Lara Lara*, 440 F. Supp. 3d 64, 69 (D. Mass. 2020).

A reasonable police officer in the circumstances would understand these statements to be invocations of the right to remain silent. Indeed here, Squire repeatedly indicated that he understood that Grubert said he would not provide information that would allow access to

Grubert's computers, that Grubert would not speak about his activity on the web apart from the fact that he used Tor and encryption, would not otherwise discuss his activity on the dark web, and only wished to speak with agents at a later date. Grubert underscored that his refusals to speak were invocations of a right to silence by referring to his right to go before a judge or before a court, and his understanding of the Miranda warning that anything that he said could and would be used against him.

    d.  <u>Mr. Grubert's right to cut off questioning was not scrupulously honored.</u>

To determine whether Mr. Grubert's right to remain silent was scrupulously honored, the court must consider "'(1) whether a reasonable period of time passed prior to the resumption [of questioning], (2) whether the same officer resumed questioning, (3) whether the suspect received fresh *Miranda* warnings, and (4) whether questioning concerned the same alleged crime.'" *United States v. Oquendo-Rivas*, 750 F.3d 12, 17-18 (1st Cir. 2014). Where there are "'repeated attempts to reverse a refusal to talk through undue pressure'" and "'repeated efforts to wear down a suspect's resistance and make him change his mind,'" the right to remain silent is not scrupulously honored. *Lara Lara*, 440 F.Supp.3d at 70, *quoting United States v. Andrade*, 135 F.3d 104, 107 (1st Cir 1998) and *Mosley*, 423 U.S. at 105-06.

Squire immediately and continuously maintained questioning of Grubert throughout the interview. *See Lara Lara*, 440 F.3d at 70 (noting First Circuit discomfort with only twenty-minute pause, and Supreme Court statement that *Miranda*'s purposes would be frustrated by momentary cessation). Squire himself, with Moynihan seated next to him, resumed the questioning. Grubert never received fresh Miranda warnings. To the contrary, when Grubert said, as articulated in proper *Miranda* warnings, that anything would be used against him, Squire said "No." *Cf. Lara Lara*, 440 F.3d at 70 (right to remain silent not scrupulously honored where, inter alia, suspect did

not receive fresh *Miranda* warnings even though she asked, "Isn't it that supposedly what I say may be used against me?"). The questioning concerned the same alleged crime.

Here Squire also made repeated efforts to wear down Grubert's resistance and make him change his mind. He used "words or actions . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Thongsophaporn*, 503 F.3d at 57 *citing Rhode Island v. Innis,* 446 U.S. 291, 300-01, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980). During the interview, Squire learned of Grubert's wife's pregnancy, miscarriages, precarious mental health, Grubert's concern for his wife, Grubert's agreement that saving the life of a child was important, that Grubert himself had mental health challenges, and that Grubert himself had been abused. In questioning Grubert after he invoked his right not to speak, Squire repeatedly spoke of what Grubert could say to his wife if he helped, said that he could save a child in danger and that Squire knew that Grubert, like most people, didn't want to see a child hurt, that time was of the essence in doing this so that waiting for a lawyer or court would not be helpful, that it would be on his conscience if he didn't, that the question for him was whether as a 32-year-old man, he would take responsibility for what he had done, and how cooperating now rather than later could be beneficial to him. *Cf. United States v. Barone*, 968 F.2d 1378, 1386 (1st Cir. 1992) ("In sum, the focus on danger, the failure to repeat warnings, the increasing length of incarceration, the officers' efforts to ingratiate themselves, and the number of encounters deliberately aimed at eliciting cooperation on the same crime are sufficient to support a finding that this was a case 'where the police failed to honor a decision of a person in custody to cut off questioning, ... by persisting in repeated efforts to wear down his resistance and make him change his mind,' *Mosley,* 423 U.S. at 105–06, 96 S.Ct. at 327–28"); *United States v. Rosario-Cintron,* 194 F.Supp.3d 161(D.P.R. 2016) (finding police statement to suspect that it was his last chance to cooperate was functional equivalent of

interrogation, failed to scrupulously honor *Miranda* invocation, and citing with favor cases ruling police statements about cooperation made to suspects to be functional equivalent of interrogation). *Cf. also Brewer v. Williams*, 430 U.S. 387 (1977) ("Christian burial speech" tantamount to interrogation and suspect deprived of right to counsel where police officer, knowing suspect was former mental patient and deeply religious, obtained incriminating remarks by saying he felt they should stop and locate a girl's body because her parents were entitled to Christian burial).

## Conclusion

For all of the foregoing reasons, HSI Agents Squire and Moynihan failed to scrupulously honor Mr. Grubert's invocation of his right to remain silent. Mr. Grubert moves that the Court grant his motion to suppress statements made as a result of the agent's unlawful conduct.

Respectfully submitted,
NEAL GRUBERT
By His Attorney,

*/s/ Sandra Gant*
Sandra Gant, B.B.O.# 680122
Federal Public Defender Office
51 Sleeper Street, 5th Floor
Boston, MA 02210
Tel: 617-223-8061

CERTIFICATE OF SERVICE

I, Sandra Gant, hereby certify that this document filed through the ECF system will be sent electronically to the registered participant(s) as identified on the Notice of Electronic Filing (NEF) on March 28, 2022.

*/s/ Sandra Gant*
Sandra Gant