UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA )
)           Criminal No: 21-cr-10001-NMG
v.                  )
)
NEAL GRUBERT,                 )
Defendant.            )
)

**<u>EXHIBIT 3:</u>**

Detention Hearing Transcript

```
 1                 UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF TEXAS
 2                      AUSTIN DIVISION

 3   UNITED STATES OF AMERICA ) Docket No. A 20-MJ-588(1) SH
                              )
 4   vs.                      ) Austin, Texas
                              )
 5   NEAL GRUBERT             ) July 8, 2020

 6
                     TRANSCRIPT OF VIDEOCONFERENCE
 7                 PRELIMINARY/DETENTION HEARING
               BEFORE THE HONORABLE SUSAN HIGHTOWER
 8

 9   APPEARANCES:

10   For the United States:    Mr. Matthew B. Devlin
                               Assistant U.S. Attorney
11                             903 San Jacinto Boulevard,
                               Suite 334
12                             Austin, Texas 78701

13

14   For the Defendant:        Ms. Charlotte A. Herring
                               Assistant Federal Public Defender
15                             Lavaca Plaza
                               504 Lavaca Street, Suite 960
16                             Austin, Texas 78701

17

18   Transcriber:              Ms. Lily Iva Reznik, CRR, RMR
                               501 West 5th Street, Suite 4153
19                             Austin, Texas 78701
                               (512)391-8792
20

21

22

23

24

25   Proceedings reported by digital sound recording,
     transcript produced by computer aided-transcription.
```

**I N D E X**

|                    | Direct | Cross | Redirect | Recross |
|--------------------|--------|-------|----------|---------|
| Witnesses:         |        |       |          |         |
| Caitlin Moynihan   | 9      | 19    | 31       | 34      |
| Edward Thomison    | 37     |       |          |         |

**E X H I B I T S**

|                 | Offered | Admitted |
|-----------------|---------|----------|
| Government's    |         |          |
| (None)          |         |          |
| Defendant's     |         |          |
| (None)          |         |          |

1          (Proceedings commence at 3:10 p.m.)

2          THE CLERK:  Court is now in session for a Rule 5

3 hearing:  20-MJ-588, <u>United States vs. Neal Grubert</u>.

4          MR. DEVLIN:  Good afternoon, Judge.

5          Matthew Devlin for the United States.

6          MS. HERRING:  Charlotte Herring for Mr. Grubert.

7          THE COURT:  Thank you.

8          And I understand that we're going to proceed

9 first with a preliminary hearing, and that that has not

10 been waived.

11          Is that accurate, Ms. Herring?

12          MS. HERRING:  Yes.  That's correct, your Honor.

13          THE COURT:  Okay.  Thank you.

14          So I'll ask Mr. Ferrell to go ahead and please

15 administer the oath to -- oh, excuse me.  Mr. Devlin, then

16 the burden will be yours to go ahead and put on --

17 identify what evidence you're going to put on before I ask

18 Mr. Ferrell to swear.

19          MR. DEVLIN:  Well, Judge, I would ask that the

20 Court take judicial notice of a couple of things.  First

21 is the complaint that is filed in Austin, the redacted

22 complaint.  Also, the -- even though it's just a

23 preliminary hearing initially, I think it's going to kind

24 of pour over into the detention hearing since we have to

25 still show the facts of the case.

1    So I'd also like to have the Court consider the

2  Pretrial Services report that's been prepared in this

3  case, as well.  I would proffer -- I would like to proffer

4  the information in the complaint itself as being for the

5  Court's consideration.  Special Agent Caitlin Moynihan

6  with Homeland Security Investigations is available to

7  testify, but I would proffer the facts contained in the

8  complaint in lieu of that.

9    THE COURT:  Okay.  So do you want to overlap into

10  -- do you want to overlap into the detention hearing

11  before I make a finding on probable cause?

12    MR. DEVLIN:  Um.

13    THE COURT:  You mentioned you thought some of the

14  testimony would be relevant to both.

15    MR. DEVLIN:  Well, I'm hope -- what I would like

16  -- I'm going to propose that we proffer most of our

17  information.  And so, the first thing to be proffered

18  would be the af -- the redacted complaint and the

19  information in there.

20    Secondly, I just, unfortunately, presented this

21  to Ms. Herring, but I would also like to proffer

22  paragraphs 55 through 58 that are contained in the search

23  warrant affidavit for Mr. Grubert's residence that the

24  affidavit is currently under seal.  I provided the

25  excerpted paragraphs just moments ago, unfortunately, to

 1   Ms. Herring.  But that -- those paragraphs are contained

 2   in the search warrant filed under Cause No. A-20-M-582 in

 3   this court.  And again, that's under seal, but I would ask

 4   that those paragraphs be considered by the Court and the

 5   Court take judicial notice at least of the existence of

 6   those -- of that information in that affidavit.  And

 7   again, that would be something that Special Agent Caitlin

 8   Moynihan with HSI would be able to talk about, and in lieu

 9   of her testimony, we would like to proffer that

10   information, as well.

11          THE COURT:  Okay.  Let me just make sure you said

12   paragraphs 55 to 58?

13          MR. DEVLIN:  Yes, Judge.

14          THE COURT:  Okay.  I'm going to take just a

15   moment to review those.

16          MS. HERRING:  Your Honor, I'm going to have

17   objections to the proposed proffer.  So I don't know if

18   the Court wants to hear those now.

19          THE COURT:  Yes.

20          MS. HERRING:  Or review that first.

21          But in terms of the redacted complaint, the first

22   thing Mr. Devlin referenced, I don't have a problem with

23   the Court reviewing the redacted complaint, which you've

24   already confirmed is the copy the Court has.  I do want to

25   go ahead and object, though, under Rule 26.2(c).  If a

1   government -- if the government's going to produce a

2   redacted statement, the Court needs to inspect it to

3   determine if the redacted portions actually need to be

4   redacted.

5          I understand -- I spoke to AUSA Paruti in Boston

6   this morning, and she's advised me that there is typically

7   a protective order put in place that was not able to be

8   obtained in the turnaround time here for me to have the

9   full complaint.  But depending on -- you know, in what

10  detail the witness is going to go into on that subject

11  matter, I'm not willing to concede that I'm okay with the

12  redactions.

13         I don't have a problem with the proffer of the

14  Pretrial Services report.  No objection there.

15         I -- and then, the third item, the portion for

16  paragraphs of the search warrant affidavit, I received

17  that by e-mail at 2:55 p.m. today, when I was still

18  meeting with Mr. Grubert for the first time.  I do not

19  know how long this document is, but it at least has, you

20  know, 58 paragraphs.  And it's unclear to me why I don't

21  have a full copy.  And I -- I would object to that proffer

22  without the calling of an agent, without the presentation

23  of the full affidavit for my the review.

24         THE COURT:  I think that makes some sense to me.

25         Mr. Devlin, would you like to be heard on that

1   objection?

2        MR. DEVLIN:  We'll go ahead and call the agent,

3   Judge.  The only thing I would note is that the complaint

4   itself was sworn out by Special Agent Greg Squire, who is

5   not going to be called to testify.  So Special Agent

6   Caitlin Moynihan will be called to testify, and that's not

7   her statement.

8        So I'm not sure that we -- you know, the

9   redactions were approved by Judge Hen -- U.S. Magistrate

10   Judge Hennessy in Boston.  He had -- there was a motion

11   attached, as you'll note, to the complaint filed here in

12   Austin to unseal the complaint as well as unseal certain

13   unredacted portions of the complaint affidavit, and that

14   was approved by Judge Hennessy.  So that's the only

15   information that we have right now that's been approved

16   for release at this point.

17        THE COURT:  I see.  Okay.

18        MR. DEVLIN:  So I'll be happy to go ahead and

19   proceed and call Special Agent Moynihan.

20        The thing I would -- before I do that, Judge, I

21   would ask the presumption applies in this case, the

22   presumption of detention.  So I would ask that the Court

23   consider that, as well, in determining the detention

24   issue.

25        THE COURT:  Okay.

1     MR. DEVLIN:  And I would go ahead -- and

2     hopefully she's on the line -- and call Special Agent

3     Caitlin Moynihan.

4          Agent Moynihan, are you there?

5          THE WITNESS:  Yes, I am.

6          MR. DEVLIN:  Okay.

7          THE COURT:  Can you turn on your camera?

8          THE WITNESS:  My camera's not working right now.

9          MR. DEVLIN:  I think she --

10         MS. HERRING:  Your Honor, I'm going to object to

11    calling a witness that the Court can't determine or have

12    the full opportunity to judge credibility of because we

13    don't have a visual.

14         MR. DEVLIN:  She just showed up.

15         THE COURT:  I believe that's Agent Moynihan has

16    just gotten her camera on.  So.

17         MR. DEVLIN:  Does she want to -- does the Court

18    want to make sure she's sworn first?

19         THE COURT:  Oh, yes, of course.  But Ms. -- I'm

20    not confident Ms. -- Agent Moynihan, can you hear us?

21         THE WITNESS:  Yes, I can.

22         THE COURT:  Okay.  So, Mr. Ferrell, can you

23    please go ahead and swear the witness?

24         THE CLERK:  Yes.

25         Do you solemnly swear or affirm that the

 1  testimony you may give in this case before the Court is

 2  the truth, the whole truth, and nothing but the truth?

 3          THE WITNESS:  I do.

 4          THE COURT:  You may proceed.

 5          MR. DEVLIN:  May I proceed?  Thank you, your

 6  Honor.

 7   CAITLIN MOYNIHAN, called by the Government, duly sworn.

 8                  DIRECT EXAMINATION

 9  BY MR. DEVLIN:

10  Q.  Agent Moynihan, would you please state your name and

11  spell your last name for the record?

12  A.  Caitlin Moynihan, M-O-Y-N-I-H-A-N.

13  Q.  And how are you employed?

14  A.  I'm currently a special agent with Homeland Security

15  Investigations in Boston.

16  Q.  And how long have been an HSI agent?

17  A.  Since October 2009.

18  Q.  And have you been involved as one of the agents in

19  this investigation?

20  A.  Yes, I have.

21  Q.  Are you familiar with the contents of the redacted

22  complaint that was filed in Austin in this case?

23  A.  Yes, I am.

24  Q.  That was not sworn out by you; is that correct?

25  A.  That's correct.

1   Q.   That was sworn out by special -- another HSI agent,

2 Greg Squire?

3   A.   Correct.

4   Q.   Okay. But to your knowledge, is the in -- are you

5 familiar with that information?

6   A.   Yes, I am.

7   Q.   And to your knowledge, is the information in the

8 redacted portion of the complaint true and accurate?

9   A.   It is.

10   Q.   Okay. Can you provide just a very brief overview of

11 the investigation as it pertains to Mr. Grubert?

12   A.   This investigation was worked jointly with another

13 law enforcement agency. It pertained to a website on the

14 dark web, referred to as Website A. A user on that

15 website was subsequently identified to be Mr. Grubert or

16 somebody from the residence of Mr. Grubert.

17   Q.   Okay. And again, the information in the complaint

18 talks about how the website was dedicated to child

19 pornography?

20   A.   Yes, it was.

21   Q.   All right. Is this an ongoing investigation?

22   A.   Yes, it is.

23   Q.   And there are other potential subjects out there who

24 have not been arrested yet; is that correct?

25   A.   That's correct.

1    Q.   And was that -- to your understanding, was that the
2    basis for a lot of the redactions in the complaint is that
3    it may have contained sensitive information that might
4    alert other potential subjects to the investigation that
5    might concern them?
6    A.   Yes.
7    Q.   Okay.  Now, as part of this, this Website A, this was
8    a Website A dedicated exclusively -- was it dedicated
9    exclusively to child pornography?
10   A.   Yes.
11   Q.   All right.  And what was Defendant Grubert's role, if
12   anything, with Website A, to your knowledge?
13   A.   I believe Mr. Grubert was a staff member on the
14   website.  He had numerous postings on the website, as
15   well.
16   Q.   All right.  And when you say he was a staff member,
17   what -- do you know what duties and responsibilities that
18   might include?
19   A.   I do not.
20   Q.   Okay.  Was a staff member -- how would a staff member
21   compare to just simply a regular user?
22   A.   It's -- again, this is not fully my case, so I don't
23   know the total ins and outs.  But a staff member has more
24   responsibility than other regular users.
25   Q.   Okay.  Would some of the staff responsibilities

1   include perhaps maintenance of the website, or perhaps

2   admitting users or members, maybe deleting users, members,

3   anything like that, answering questions that other users

4   might have?

5   A.   Yes.

6   Q.   Okay.  Now, you said that he -- that the defendant

7   had postings on the website.  Can you describe in a little

8   bit more detail some of the nature of those postings?

9   A.   Yes.  Many of the postings observed by this user

10  talked about ways to avoid being detected by law

11  enforcement, and specifically using encryption and

12  different ways to use encryption, and how to go about

13  destroying evidence to, again, avoid being detected by law

14  enforcement.

15  Q.   Okay.  Were there any -- or did he make any postings

16  that contained or referred to child pornography?

17  A.   Yes, he did.

18  Q.   Okay.  Can you give, again, a general overview of

19  what those entailed?

20  A.   To my knowledge, the user posted child pornography on

21  the website.

22  Q.   And what was -- what was the purpose -- this --

23  excuse me.  Let me -- I've got three questions going and

24  I'm trying to say them all at once.

25          This website was located where?  Was it something

1  that it could -- could be Googled?

2  A.    No.   This website was located on the dark web.

3  Q.    And when you say the dark web, what are you talking

4  about?

5  A.    You needed to use the Tor browser to access it.

6  Q.    Okay.   The Tor browser is an acronym for the Onion

7  Router; is that correct?

8  A.    That's correct.

9  Q.    And what is the Tor browser?

10  A.    I can't provide a great description to the Tor

11  browser.   I mean, it's the browser used to access the dark

12  web.

13  Q.    Okay.   And things are not as searchable on the dark

14  web as they are on the -- you know, say, the web that most

15  people use that they can Google stuff; is that correct?

16  A.    That's correct.

17  Q.    All right.   And in fact, even on the dark web, not

18  everybody could find a particular website unless they had

19  an address to it; is that correct?

20  A.    Correct.

21  Q.    All right.   So there were -- was the purpose of the

22  website for people to discuss and exchange child

23  pornography?

24  A.    Yes.

25  Q.    Okay.   And what is the -- do you know what the

1  current status of Website A is?

2  A.   It's still active.

3  Q.   Okay.  Now, you talked earlier about the defendant

4  had also gotten onto Website A to advise others about

5  encrypting data; is that right?

6  A.   That's correct.

7  Q.   What was the context of those conversations?  Why

8  would he -- why did it appear that he was telling people

9  to do that?

10  A.   Because then it's harder for law enforcement to

11  access any data if there ever was a knock on your door, as

12  he put it.

13  Q.   Okay.  So he was talking specifically about law

14  enforcement and the possible ways that people could get

15  caught.

16  A.   That's correct.

17  Q.   All right.  Did he go any further and recommend any

18  tools that could be used to do that?

19  A.   Yes, he did.

20  Q.   And these would be specific software or possibly

21  hardware tools that could be used to encrypt?

22  A.   That is correct.

23  Q.   Okay.  Now, the fact that this is an ongoing

24  investigation, is there -- is there any concern on your

25  part or law enforcement's part that the investigation

1  could be affected by this defendant?

2  A.  Yes.

3  Q.  And specifically, what do you mean by that?

4  A.  I believe that if this defendant was to be released,

5  that he would be back on this website warning other users

6  of law enforcement.

7  Q.  Okay.  So when he -- so when Defendant Grubert was

8  arrested, the website was not taken down.  It was just

9  Defendant Grubert was taken down.

10 A.  That's correct.

11 Q.  Okay.  Did you participate in the execution of the

12 search warrant at his residence?  I believe it was last

13 Thursday, the -- July 2nd?

14 A.  Yes, I did.

15 Q.  Okay.  Can you summarize what happened there?  Did

16 the search warrant authorize what's called a no-knock

17 entry?

18 A.  Yes, it did.

19 Q.  And what -- generally speaking, what was the basis

20 for requesting a no-knock entry?

21 A.  One of the main reasons for requesting that was,

22 again, based on posts observed on Website A by the user,

23 talking about his level of expertise with encryption and

24 ways to avoid being detected by law enforcement, our

25 belief was that a no-knock warrant was the best way to

1    preserve evidence.

2    Q.   Okay.  What happened -- did you -- you entered the

3    residence in the evening; is that correct?

4    A.   That's correct.

5    Q.   And what happened as a result?  Were you able to

6    recover any computer devices from his residence?

7    A.   Electronic media and computers were seized at the

8    time of the search warrant.  Yes.

9    Q.   Okay.  Were any of them accessible, to your

10   knowledge?

11   A.   Accessible in what way?  I'm sorry.

12   Q.   Were -- did they -- you would justify the no-knock as

13   possibly to avoid encryption.  Was that successful?

14   A.   No.  It was not.

15   Q.   Okay.  What did you find when you got in?

16   A.   We found that the laptop being utilized had been

17   shut.  And it is our belief that at the time that entry

18   was made to the residence at that time, Grubert shut the

19   laptop, effectively locking law enforcement out from the

20   laptop.

21   Q.   Okay.  So the -- the information was encrypted; is

22   that correct?

23   A.   That's correct.

24   Q.   All right.  Did you or any other agents have an

25   opportunity to speak with Defendant Grubert at the time of

```
 1  the execution of the search warrant?
 2  A.   Yes, I did.
 3  Q.   And was he advised of his constitutional rights at
 4  the time?
 5  A.   Yes, he was.
 6  Q.   And did he answer some of your questions?
 7  A.   He did speak with us.  Yes.
 8  Q.   Okay.  What did he tell you that would be relevant to
 9  the hearing that we're here for today?
10  A.   Again, during the course of the conversation, Mr.
11  Grubert discussed with us that, as he put it, anything
12  that can leave that residence that belongs to him is
13  encrypted.  He also made it known that he was very proud
14  of his familiarity with the Tor network, with the Tor
15  browser and dark web, and that he'd been using it, I
16  believe he said, since he was 13 years old.  And he also
17  said that he would not share any passwords with us.
18  Q.   Okay.  And that -- and he followed through on all
19  that; is that right?  He still hasn't -- there's been --
20  no password's been shared or found?
21  A.   That's correct.  They have not been shared.
22  Q.   Okay.  Have you received any information from any
23  other source as to what might be on his computers?
24  A.   Yes.
25  Q.   And what is -- what is that information?
```

1  A.   Information's been received that his computer is, in

2  fact, encrypted and that there is a long password to get

3  into it.

4  Q.   Okay.  Is there any content on there that might be of

5  relevance to your investigation?

6  A.   We believe that there is, however, we have not found

7  it.

8  Q.   Okay.  Do you know what his situation was at the

9  house?  Did he own that house or did he rent it?  Do you

10 know?

11 A.   He was renting the house.

12 Q.   Okay.  And in terms of his employment, do you know

13 how he was employed at the time?

14 A.   Yes.  He informed us that he was employed by

15 Horseshoe Bay Resort.

16 Q.   Okay.  Do you know if, at present, he is still

17 employed there?

18 A.   At present, I do not know.  At the time of the search

19 warrant, he was.  He stated that he had worked that day.

20 Q.   Okay.  All right.  Judge, at this time, we're going

21 to pass the witness.

22       THE COURT:  Okay.  Ms. Herring, do you have any

23 cross-examine for Agent Moynihan?

24       MS. HERRING:  Yes, your Honor.  Thank you.

25

                          CROSS-EXAMINATION

BY MS. HERRING:

Q.   Agent Moynihan, you said that this was part of an

ongoing investigation; is that right?

A.   That's correct.

Q.   And how long have you been a part of that

investigation or this investigation?

A.   I would say a little over a month.

Q.   And how long has that investigation been going on?

A.   I'm not familiar with that.  I know law enforcement

has been investigating Website A and other websites for a

long time.

Q.   Is a long time months, years, a year?

A.   Again, I don't know because I'm not -- I'm not part

of that particular investigation.

Q.   And how long has Mr. Grubert been a target of the

investigation?

A.   I'm unfamiliar with how long he's been a target of

the investigation.  I know that he came into our attention

approximately a month ago.

Q.   HSI has only been targeting Mr. Grubert for one

month?

A.   Say that again.

Q.   HSI, or I don't know which other agency is involved,

has only been interested and tracking Mr. Grubert for one

1  month?

2  A.   HSI Boston has been involved with Mr. Grubert for

3  approximately a month.

4  Q.   And what was -- you talked about a user name.  What's

5  the user name that Mr. Grubert used?

6  A.   As far as I know, that user name has been redacted.

7  I would have to check with Mr. Devlin if we're sharing

8  that at this point.

9       MR. DEVLIN:  Judge, I would, at this point, since

10 that has been -- if that has been redacted by the judge in

11 Boston, at this point, it's not.  We ask that it not be

12 disclosed at this time.

13      THE COURT:  I'm sorry.  I didn't understand you,

14 Mr. Devlin.  You said it has -- has or has not been

15 redacted by the judge in Boston?

16      MR. DEVLIN:  It has been re -- that has been

17 redacted.  It's not in the un -- it's not in the version

18 that has been filed here in Austin; if that has been

19 redacted by the judge in Boston, that's still under seal,

20 and I would object to its disclosure at this time.

21      THE COURT:  Okay.  I'll sustain the objection.

22 Q.   (BY MS. HERRING) Agent Moynihan, did Mr. Grubert use

23 one user name or multiple user names?

24 A.   I am only aware of one user name.

25 Q.   What steps did you take to confirm that the person

1   using that user name is Mr. Grubert?

2   A.   As far as what?  In the interview, the user name came

3   up in a rather roundabout way, and Mr. Grubert appeared

4   confirm that he was the user.

5   Q.   Well, let's say before his arrest, what led you or

6   other investigators to believe that Mr. Grubert was the

7   one using the user name you were interested in?

8   A.   Because in one of the videos that was shared, Mr.

9   Grubert's face was seen.

10  Q.   In one of the videos shared by the user name?

11  A.   Say that again.

12  Q.   You said in one of the videos shared, Mr. Grubert's

13  face was seen.  How does that make Mr. Grubert the user of

14  the user name?

15  A.   I'm not sure, Mr. Devlin, how to proceed with

16  answering that.

17  Q.   In your investigation, what led you to believe that

18  Mr. Grubert was the person behind the user name that you

19  were investigating?

20  A.   Because there was other evidence where we had a phone

21  number that resolved back to Mr. Grubert, and videos

22  shared via that phone number had Mr. Grubert's face in it.

23  Q.   Was the phone number on the website?

24  A.   No.  The phone numbers's not on the website.

25  Q.   So how does Mr. Grubert's phone number connect to the

1   user name?

2   A.   I would have to refer back to the complaint or the

3   search warrant affidavit for that.

4   Q.   You can do that.

5   A.   Okay.  So I'm referring to paragraph -- paragraphs 4

6   -- starting paragraph 4 in the complaint affidavit, if I

7   can just go ahead and read from there.  Actually, start on

8   paragraph 5.

9   Q.   The Judge has the complaint.  So I don't -- I'm not

10  going to ask you to read it.

11  A.   Okay.  Well, I'm trying to refresh my memory.

12         So in the course of the forensic examination of

13  his cellphone that was seized with the other suspect that

14  was arrested, there were images and videos found there of

15  child exploitation evidence.  So in the file structure of

16  those, they were name -- we're referring to them as folder

17  one and folder two.  Most of the file names began with the

18  word "Signal," indicating that they were sent via the

19  Signal app, and within that file structure, the user name

20  that has since been redacted was seen in the file

21  structure of those folders which contain the videos.

22  Q.   So I just want to make sure that I understand how

23  this connects to Mr. Grubert.

24         You examined a video that was saved on someone

25  else's phone that had a file name, part of which was a

1  user name, part of which was a user name from the Tor

2  website?

3  A.   So the user name that's been redacted that's

4  associated with Mr. Grubert was part of that file

5  structure in the folder name where the child exploitation

6  videos were found on the other suspect's phone.  Those

7  videos and more than one of those videos, Mr. Grubert's

8  face was seen.

9  Q.   And why do you believe the user name is Mr.

10  Grubert's?

11  A.   I believe I just explained that to the best of my

12  ability.  I don't -- I'm not sure how else to explain

13  that.

14  Q.   Well, Tor has user names and you have to figure out

15  who's the user, right?  Isn't that a very simplistic

16  representation of how Tor works?

17  A.   Not necessarily how I would describe it.  But.

18  Q.   I guess you don't -- it seems like you don't know

19  maybe is the answer as to how Mr. Grubert is connected to

20  the user name?

21  A.   No.  I do.  I just explained this to the best of my

22  ability.  I'm not sure how else to.

23  Q.   Okay.  But I just want to make sure that your

24  explanation is clear.

25          You or someone in Homeland Security did a

1  forensic examination of a phone and found a video, and Mr.
2  Grubert was in the video, and a file name on that video
3  had a user name.  So I still don't understand how the user
4  name and the file name in the video that Mr. Grubert was
5  in means Mr. Grubert was using the user name.
6  A.   So just to correct you, it was not HSI agents who
7  examined the phone.  That was a different law enforcement
8  agency who examined the phone.  So they recognized the
9  name that we're referring to as folder one as the user
10  name of the individual whose activity was observed on
11  Website A.
12  Q.   Okay.  So you don't know how that law enforcement
13  agency, somewhere prior to your involvement in the case,
14  linked the user name to Mr. Grubert?
15  A.   Again, I feel that I just explained that, but I guess
16  I missed.
17  Q.   Okay.  We'll go on to something else.
18        You talked about staff members and you -- when
19  Mr. Devlin asked you if Mr. Grubert was a staff member on
20  the website, you said yes; is that right?
21  A.   That's correct.
22  Q.   And then, you said that you don't know exactly what a
23  staff member does; is that right?
24  A.   So again, I can refer to the search warrant affidavit
25  and describe it from there, if you'd like.  The

1 paragraph --

2 Q.   I don't have the part that describes it.

3 A.   Okay.  So if you refer to paragraph 14, staff members

4 typically both check in when they log in so other staff

5 members may verify their identity in some manner, as well

6 as three other members as they log into the room.

7 Q.   Did you write that search warrant affidavit?

8 A.   No, I did not.  Mr. Devlin explained that Agent

9 Squire wrote the search warrant affidavit.

10 Q.   So Mr. Squire --

11 A.   As well as the complaint.

12 Q.   Okay.  Thank you.

13      So just so you're aware, I don't have a copy of

14 that, so when you say paragraph 14, I haven't seen that.

15 A.   Okay.

16 Q.   So you said staff members, I think you just read, can

17 check people in?  Is that?

18 A.   That's what paragraph 14 says.  Yes.

19 Q.   And did Mr. Grubert check people in?

20 A.   To my knowledge, and based on reviewing his posts,

21 yes, I believe he did.

22 Q.   When?

23 A.   Say that again.

24 Q.   When?  When did he check people in?  Like what dates?

25 A.   I believe almost daily.

```
 1   Q.    Why do you believe that?
 2   A.    Based on review of posts on Website A.
 3   Q.    In the one month that you worked on the
 4   investigation?
 5   A.    That's correct.  Yes.
 6   Q.    And then, you said staff members delete users?  Is
 7   that?
 8   A.    I believe that's how Mr. Devlin described it.  Again,
 9   I can -- since you don't have this in front of you, I can
10   read a footnote from Mr. Squire's affidavit.
11           In my undercover work, I've come to learn that
12   hidden services dedicated to sexual exploitation of
13   children typically of members that function as, quote,
14   unquote, staff often referred to as administrators or
15   moderators of the sites.  Individuals that hold these
16   roles regularly perform site maintenance, moderate chats,
17   approve desk, promote members, review images and videos
18   that are posted, and are looked to as authority figures by
19   their members on the sites.  Based on their observations
20   and activity on different dark web hidden services
21   dedicated to sexual exploitation of children, undercover
22   agents believe the suspect user acts in a staff capacity
23   on at least two other such sites using the same user name.
24   Q.    And so, the site maintenance, did you observe Mr.
25   Grubert perform site maintenance?
```

1    A.   I personally did not.

2    Q.   Did you observe him promote members?

3    A.   I did not.  Again, this was not -- I was not the

4    primary investigator in this investigation.

5    Q.   Did you observe him review images?

6    A.   I did not.

7    Q.   Do staff members interact with children?

8    A.   I do not know.

9    Q.   Did Mr. Grubert interact with minor children that you

10   observed?

11   A.   You cut out at the last part.

12   Q.   Did you observe Mr. Grubert interact with minor

13   children?

14   A.   To my knowledge, no.

15   Q.   You mentioned the arrest of this other person that

16   led to the video that Mr. Grubert's face was in.  And part

17   of this complaint references a text message between that

18   arrested individual and the person -- the suspect number.

19        What was that text conversation about?

20   A.   I'm not familiar.

21   Q.   Was it about child pornography?

22   A.   I'm still not familiar.  I don't know.

23   Q.   Do you know if law enforcement investigated the

24   person behind each number stored as a contact in the

25   arrested person's phone?

1  A.   I do not know.

2  Q.   Are you familiar with the image referenced in the

3  complaint affidavit -- or, I guess, the video.  You did

4  mention the video, right?

5  A.   Yes.

6  Q.   You've seen that video?

7  A.   Yes.

8  Q.   And in the video, Mr. Grubert is looking at a video

9  of child pornography?  Is that right?

10 A.   Which specific video?

11 Q.   A video of child pornography?  The video referenced

12 in paragraphs.

13 A.   Number 15A and B?

14 Q.   No.  I was talking about 7.

15 A.   Seven.

16 Q.   Oh, sorry.  Five.  The video with the audio.

17 A.   Yes.

18 Q.   Have you seen that video?

19 A.   Yes, I have.

20 Q.   And so, the video that has Mr. Grubert in it

21 masturbating to a video of child pornography, Mr. Grubert

22 didn't make the video in the video, right?

23 A.   I think you may have lost me, but I think I know what

24 you're saying.  Mr. Grubert was masturbating to a video of

25 child pornography, recording himself masturbating to that

1  video, thus -- yeah.

2  Q.   And do you have any reason to believe that Mr.

3  Grubert made the video of child pornography that he was

4  masturbating to?

5  A.   He did not make the video child pornography that was

6  on the computer screen.  He made that video of child

7  pornography of him masturbating to child pornography.

8  Q.   I see.  Now, turning to 15A and B, yes, I have

9  questions about that.  Did you see that -- I can't tell if

10  it's a -- I think it's a video in 15A?

11  A.   I did not see the videos referenced in 15.

12  Q.   Do you know if the female that's referenced isn't

13  digitally manipulated image or if it's a particular child?

14  A.   Again, I don't know.  I haven't -- I have not seen

15  the ones referenced in paragraph 15.

16  Q.   You talked about the -- you started talking about

17  encrypting data and the encrypted computer that Mr.

18  Grubert had when you went to the home, right?

19  A.   That's correct.

20  Q.   And you were part of the search warrant execution

21  team?

22  A.   Yes, I was.

23  Q.   It's -- is it true that -- I mean, encryption is

24  commonly used by Tor users in general, right?

25  A.   Encryption's common, yes.

1  Q.   And Tor, the Tor browser that you referenced,

2  everything on Tor isn't necessarily child pornography,

3  right?

4  A.   That's correct.

5  Q.   And one of the reasons users use the Tor browser is

6  specifically to remain anonymous, right?

7  A.   Correct.

8  Q.   And so, that could be remaining anonymous for, in

9  some cases, illicit activity in child pornography; in

10  other cases, some other activity that's not necessarily a

11  law enforcement interest, right?

12  A.   Correct.

13  Q.   In paragraphs 8, I guess, 20 and 21, there's a

14  reference to videos, plural.  And I understand that you're

15  not the person who wrote this complaint, but are you aware

16  of multiple videos other than the ones that we've already

17  talked about that Mr. Grubert appears in?

18  A.   Yes.

19  Q.   Are those detailed somewhere in here, or is this just

20  your knowledge outside of the complaint?

21  A.   I've observed at least two videos where Mr. Grubert

22  was seen.

23  Q.   He appears in the videos.

24  A.   His reflection, it was in one, and then, his face

25  appeared in another.  Yes.

```
 1   Q.   And he's not physically present in the same place as
 2   a child in either video?
 3   A.   To my knowledge, no.
 4   Q.   I don't have any further questions.
 5        THE COURT:  Anything further for this witness,
 6   Mr. Devlin?
 7        MR. DEVLIN:  Yes, Judge.  Let me just clarify.
 8                    RE-DIRECT EXAMINATION
 9   BY MR. DEVLIN:
10   Q.   Looking at the -- Agent Moynihan, looking at the
11   redacted complaint, not the search warrant affidavit,
12   looking at the redacted complaint, paragraphs 4 through 8
13   basically describe the activities of Mr. Grubert, and he
14   is the person who is the suspect user?
15   A.   That's correct.
16   Q.   Okay.  And he was tied -- in other words -- well, he
17   was tied to this because there was a folder that had the
18   user name of Mr. Grubert at the time of the suspect user.
19   A.   Correct.
20   Q.   Okay.  And as it describes in paragraphs 7 and 8, the
21   -- another suspect, who was just described with a small S
22   suspect, had a cellphone, and it had only one phone number
23   in the contacts; is that right?
24   A.   That's correct.
25   Q.   And that number was known as -- doesn't matter what
```

1  the number is, but it's known as the suspect number; is

2  that correct?

3  A.   Yes.

4  Q.   That suspect number was ultimately traced to

5  Defendant Grubert, correct?

6  A.   Correct.

7  Q.   All right.  And that's described later in paragraph

8  16 of the redacted complaint that went back to Verizon

9  Wireless and identified him as the subscriber of that

10  suspect number.

11  A.   Yes.

12  Q.   Okay.  So we have the word -- unfortunately, we have

13  the word "suspect" used a few times in here, but the small

14  S suspect had Defendant Grubert's number on there.  And in

15  addition to the information about the videos in which

16  Defendant Grubert was seen engaging in the activities that

17  are described there and that you described earlier, that

18  information ties this defendant to the -- to the website's

19  activities and also to the suspect who had his number on

20  his cellphone --

21        MS. HERRING:  I'm going to object to the

22  testifying.

23        THE COURT:  Sustained.

24  Q.   (BY MR. DEVLIN) So does that information tie

25  Defendant Grubert to this case?

1   A.   Yes, it does.

2   Q.   Okay.  Going back to the encryption of computers, Ms.

3   Herring was asking about the Tor browser and how that is

4   -- that's an encrypted network.

5          In this case, when you talk about the fact that

6   Defendant Grubert's computers and devices were encrypted,

7   what are you talking about there?  Is it encrypted in the

8   same way that the Tor browser is, or is it totally

9   different kind of encryption?

10  A.   No.  It's something that he had done himself that was

11  beyond the Tor browser.

12  Q.   Okay.  Would that involve the use of passwords?

13  A.   Yes.

14  Q.   Okay.  Any other security type of software, as well?

15  A.   He had -- there were posts of him mentioning using

16  Tails, a Windows-based operating system, via thumb drive.

17  Q.   Okay.  Do you happen to know what Tails -- T-A-I-L-S,

18  is that how it's spelled?

19  A.   That's correct.

20  Q.   And that's a type of security software or encryption

21  software?

22  A.   That's correct.

23  Q.   All right.  Did Defendant Grubert at the time of the

24  search warrant discuss any of these activities relating to

25  Website A?

1   A.   In terms of what?

2   Q.   Did he make any statements that he was involved with

3   Website A?  Did he make any statements that he was

4   involved with the suspect who was identified in here?

5   Anything along those lines?

6   A.   In roundabout ways, yes.

7   Q.   And what do you mean by that?

8   A.   He didn't come right out and exactly say what his

9   user name was, but acknowledged it kind of in a slipup.

10  He also acknowledged that he really trusted this other

11  user who he'd sent the videos to, and acknowledged having,

12  like I said, been on the dark web and this website for

13  some time.

14  Q.   Okay.  All right.  I pass the witness.

15          THE COURT:  Ms. Herring, do you have any further

16  re-cross?

17          MS. HERRING:  Yes, your Honor.  Just a couple of

18  questions.

19                    RE-CROSS EXAMINATION

20  BY MS. HERRING:

21  Q.   So I'm -- reading back, Mr. Devlin asked you when

22  you're talking about why you know that Mr. Grubert was the

23  user, and he said the folder had the user name of Mr.

24  Grubert at the time he was the suspect user, and you said

25  yes to that, right?

1   A.   That's correct.

2   Q.   So I still want to understand how law enforcement

3   believed Mr. Grubert was the suspect user.

4   A.   I'm just not sure how to explain it again.  I've

5   tried to explain it the best that I can.  So I -- I can't

6   explain it any further than I already have.

7   Q.   Okay.  Going on just quickly on the encryption again,

8   it's not illegal to encrypt a computer, right?

9   A.   It is not.

10  Q.   And that Tails software you mentioned, is that some

11  kind of illicit software for encryption?

12  A.   It's not illegal.  No.

13  Q.   Nothing further, your Honor.

14          THE COURT:  Okay.  Thank you.

15          I believe the -- may the witness -- the witness

16  could be excused at this time unless there's anything

17  further for her?

18          MR. DEVLIN:  That's correct, your Honor.

19          THE COURT:  Okay.  And is there any -- any

20  further evidence that you have, Mr. Devlin, going to

21  probable cause?

22          MR. DEVLIN:  No further evidence going to

23  probable cause at this time, Judge.

24          THE COURT:  Okay.  Would the -- would counsel

25  like to be heard on the preliminary portion of our hearing

 1  today?  Would you like to reserve your arguments till

 2  after the detention portion?

 3          MR. DEVLIN:  I would like to do it all at once,

 4  Judge, if that is all right with you.

 5          THE COURT:  Okay.  It is.

 6          Ms. Herring, would you like to be heard at this

 7  time?

 8          MS. HERRING:  Your Honor, I can argue both at the

 9  end.  I'm fine with that.

10          THE COURT:  Okay.  Thank you.

11          With that, then, we'll go on to any witnesses or

12  evidence that concern the detention decision today.

13          MR. DEVLIN:  Yes.  I would like to call Edward

14  Thomison, please.

15          THE COURT:  And I had stopped his video, and I

16  will ask him to start it now while we were taking the

17  testimony from Agent Moynihan.  So I've asked Mr.

18  Thomison -- his video's started and you are muted, Mr.

19  Thomison.

20          So at this time, I'll ask Mr. Ferrell, the

21  courtroom deputy, to administer the oath.

22          THE CLERK:  Okay.  Do you solemnly swear or

23  affirm that the testimony you may give in this case before

24  the Court is the truth, the whole truth, and nothing but

25  the truth?

| | |
|---|---|
| 1 | THE WITNESS:  I do. |
| 2 | THE COURT:  Thank you. |
| 3 | Mr. Devlin, you may proceed. |
| 4 | MR. DEVLIN:  Thank you, Judge. |
| 5 | EDWARD THOMISON, called by the Government, duly sworn. |
| 6 | DIRECT EXAMINATION |
| 7 | BY MR. DEVLIN: |
| 8 | Q.   Mr. Thomison, can you please state your name and |
| 9 | spell your last name? |
| 10 | A.   My name is Edward.  My last name is Thomison, |
| 11 | T-H-O-M-I-S-O-N. |
| 12 | Q.   And, sir, do you know defendant in this case, Mr. |
| 13 | Grubert? |
| 14 | A.   Yes, I do. |
| 15 | Q.   And how do you know him? |
| 16 | A.   He was married -- he's married to my daughter. |
| 17 | Q.   And what's your daughter's name?  What's her first |
| 18 | name? |
| 19 | A.   First name's Katrina and her last name is Grubert. |
| 20 | Q.   Does she go by Katy? |
| 21 | A.   Katy, yes. |
| 22 | Q.   Okay.  How long have you known Mr. Grubert? |
| 23 | A.   Approximately three years. |
| 24 | Q.   Okay.  And how long have -- have he and your daughter |
| 25 | been married? |

1   A.   Two years.

2   Q.   All right.  They lived -- they live together in

3  Bertram, Texas; is that correct?

4   A.   Yes, sir.  That's correct.

5   Q.   Okay.  Do they have any children?

6   A.   No, sir.

7   Q.   Okay.  Is your daughter pregnant at this time?

8   A.   Yes, sir.  She is about 13 weeks.

9   Q.   Okay.

10  A.   Little over two months -- three months.

11  Q.   All right.  Now, prior to this -- and I hate to bring

12  this up, but we've talked about it and I think it's

13  important.  She has had a couple of other pregnancies

14  recently; is that correct?

15  A.   Yes.  They ended in miscarriage.

16  Q.   Okay.  Both -- there were two -- how many of them

17  were there?

18  A.   Two.

19  Q.   Two and both ended in miscarriages?

20  A.   Yes, sir.

21  Q.   Do you know why -- do you what might have caused the

22  miscarriages?

23  A.   As it was told to me now, I believe it was a

24  relationship with Neal Grubert, the stress that she was

25  put into and the bits and pieces she knew about what was

1  going on with him with these charges.

2  Q.  Okay.  What has been -- I guess we'll segue into

3  that.  What was -- what do you know about the state of

4  their marriage?

5  A.  Well, as it is now, it's not good, of course.  I

6  believe that she was under a great deal of stress, and

7  after she left him, she did emphasize that he was

8  manipulative and abusive --

9        SPEAKER:  No.

10 A.  -- not in a physical manner but in a mental capacity.

11 And she was aware of some of the activity that he was

12 doing, and I think this reflects on what happened to her

13 with the miscarriages and that sort of thing.

14 Q.  (MR. DEVLIN) Okay.  Can you describe a little bit

15 more what you mean by manipulative?

16 A.  Well, from the information that Katy gave me is that

17 --

18       MS. HERRING:  I'm sorry to interrupt, sir, just a

19 moment, but I want to object to presenting this hearsay

20 information if it sounds like, you know, there's a

21 potential witness in the room and she can provide this

22 herself.  But presenting it through her father, I have to

23 object.

24       THE COURT:  We did hear some extraneous noise in

25 the background.  Is there someone else present there with

1   you who's speaking, Mr. Thomison?

2           THE WITNESS:  Yes, ma'am.

3           THE COURT:  And who is that?

4           THE WITNESS:  My daughter and my wife are here

5   listening.

6           THE COURT:  Okay.  So I think Ms. Herring's

7   objection is well taken, Mr. Devlin.  I would say if that

8   is we're hearing, you know, any testimony from Ms.

9   Grubert, of, course, they can be there.  But if they're

10  going to speak, then I would sustain her objection to

11  hearsay evidence from Mr. Thomison on Katrina Grubert's

12  behalf.

13          THE WITNESS:  I can move to a different --

14          MR. DEVLIN:  Hold on, sir, hold on, sir, hold on,

15  sir.

16          Judge, I would ask -- I would concur with you on

17  that.  I would say, though, that hearsay is admissible at

18  this hearing, and we would ask that the objection not be

19  sustained based on hearsay.  But I can understand the

20  remainder of the objection regarding other persons present

21  in the room.

22          THE COURT:  Okay.  So is there any remedy that we

23  need to have for that?  Should we need to -- should Ms.

24  Grubert -- we have not had this arise in a Zoom setting

25  before, as opposed to in the courtroom.

1           Is there anything that either you, Mr. Devlin, or

2    Ms. Herring would like action to be taken by the witness

3    or the other audience members?

4           MR. DEVLIN:  I would certainly recommend that Mr.

5    Thomison be either moved to another room where he's alone

6    or that the other people in the room would leave.

7           MS. HERRING:  I would concur with that

8    suggestion.

9           THE COURT:  Thank you.

10          Then we'll ask for that to happen, Mr. Thomison.

11          THE WITNESS:  They have removed their selves from

12   the room.

13          THE COURT:  Both of the other -- your wife and

14   your daughter have both left.

15          THE WITNESS:  Yes.  I'm here alone.

16          THE COURT:  Okay.  Thank you very much.  We can

17   proceed then.

18          THE WITNESS:  You're welcome.

19   Q.  (BY MR. DEVLIN) Mr. Thomison, to be clear, were any

20   of -- were either your daughter or your wife telling you

21   anything right now, basically whispering in your ear, if

22   you will, about any of the things that you've been saying?

23   A.  No, sir.

24   Q.  Okay.  These are -- a lot of this is based on

25   conversations that occurred out -- before all this and not

1   involved with them being present in the room right now?

2   A.   No, sir.  These conversations were prior to this

3   hearing.

4   Q.   Okay.  I might have said that and confused you --

5   A.   With my daughter.

6   Q.   Okay.  Well, then, I will go ahead and repeat again.

7   You had mentioned that you felt that there was some

8   manipulation going on.  Can you describe that in further

9   detail?

10  A.   Well, one particular detail that I'll tell you about,

11  he had a phone with a text in a sexual explicit nature

12  that involved talking about a child that she seen, and

13  that when she seen it, she questioned him on it and said

14  that he would not do that no more.

15  Q.   Sir, if you need to move to another room, why don't

16  you go ahead and do that, and then, you can go ahead and

17  resume speaking.

18  A.   I'm here now.

19  Q.   Okay.  Is there anybody else in the room with you?

20  A.   No.

21  Q.   Okay.

22          THE COURT:  And I'll just add to that, please,

23  sir, Mr. Thomison, if you'd have a seat there, that way,

24  we could have the camera on your face.  Thank you.

25          THE WITNESS:  I'm here now.

1      THE COURT:   Thank you.

2  Q.   (BY MR. DEVLIN) Go ahead.   I'm sorry to interrupt.

3  Go ahead and continue.

4  A.   Well, it's okay.   I know this is -- this is

5  difficult.

6      Anyway, back to what I was explaining, it was of

7  a sexual nature that involved a child.   She questioned

8  him.   This is what she told me.   And then, they talked

9  about it, and he said he wouldn't be doing that no more.

10  And there's one other conversation that they had that I

11  could tell you about that she told me that really put her

12  in fear.   I don't know exactly when it happened.   If you

13  want me to continue right now about that.

14  Q.   You may.   Go ahead.

15  A.   Okay.   Because she specifically asked him when she

16  found this other information out, if we have a child, are

17  you going to touch our child or hurt our child like that?

18  And she said that he explained that he couldn't promise

19  that he would not because he loves them so much, and that

20  was what she said that he said, which gave me concern,

21  especially about him being released.

22  Q.   You said that she said the conversation was that she

23  asked him that would you touch him or be with him like

24  that.   What are you referring to when you say "that"?

25  A.   In a sexual nature.

```
 1   Q.   Okay.
 2   A.   I'm sorry.
 3   Q.   Well, I don't mean to ask you to be explicit, but I
 4   think it's important that you be explicit about it
 5   because --
 6   A.   Yes, sir.
 7   Q.   -- we don't want to assume anything.
 8   A.   Right.
 9   Q.   So she said, you know, would you touch or do anything
10   to the -- to our -- was she referring to -- who was she
11   referring to, to a child or our child?
12   A.   The child that she's pregnant with now.
13   Q.   Okay.  And he responded that he could not answer that
14   question.
15   A.   He could not promise that he wouldn't.
16   Q.   Promise that he wouldn't.  Okay.
17   A.   That's what she said, her words.
18   Q.   Now, were you present for that conversation.
19   A.   No, sir.  I was not.
20   Q.   All right.  And who shared that with you?
21   A.   My daughter.
22   Q.   All right.  Is there any other aspect of manipulation
23   that you can explain for us in any further detail?
24   A.   No, sir.  Not at this time.  Nothing that I could
25   think of other than those things which she felt like she
```

1   was stuck and was afraid to tell anybody because of the

2   nature of what he was doing.

3   Q.   Okay.  Are you aware of whether or not Mr. Grubert

4   had made any threats to harm himself or anyone else?

5   A.   Yes, sir, I have, and I'll explain.  My daughter did

6   tell me that he told her if she ever left, that he would

7   harm his self.

8   Q.   Do you know -- did he specify how he would do that?

9   A.   No, sir.  Not to my knowledge.

10  Q.   Okay.  Do you know what she took that to mean?  Would

11  that be injure himself?  More serious than just injury?

12  A.   Well, the way I took it is to kill his self, harm his

13  self, yeah, serious injury.

14  Q.   Okay.  Did Mr. Grubert have any firearms in the

15  house?

16  A.   Yes, he did.

17  Q.   Okay.  Are there -- what happened -- what has

18  happened to those firearms?

19  A.   I have them at my home now.

20  Q.   Okay.  Are there any more firearms left in his home?

21  A.   Not that I'm aware of.

22  Q.   Okay.

23  A.   And not that my daughter's aware of.

24  Q.   All right.  If for -- if the Judge determined that he

25  should be released, would he be allowed to live with you?

1    A.    No, sir.  Absolutely not.

2    Q.    Why not?

3    A.    Because I fear for my child's life, based on the

4    information that I received or read in the complaint.  And

5    I also have a 14-year-old granddaughter that lives with me

6    and -- no.  He is not welcome here.

7    Q.    Do you know if your daughter, his wife, is willing to

8    have him come back and live with her?

9    A.    No.  She is not.

10   Q.    Okay.  Is she residing at their -- at the residence

11   in Bertram anymore?

12   A.    No, sir.  Immediately after finding this information

13   out, we moved her and all of her belongings to my house.

14   Q.    Were they -- did they own that house or were they

15   renting it?  Or did they have some other arrangement?

16   A.    They were renting it.

17   Q.    Okay.  Do you know what the status is of the rental?

18   A.    Right now, it's damaged as a result of the search

19   warrant.

20   Q.    Uh-huh.

21   A.    And we've since called the owner so they can make the

22   proper repairs, and it's -- there's a neighbor that lives

23   next to them that's kind of a caretaker of the property,

24   and they're trying to make those repairs.

25   Q.    Okay.  If Mr. Grubert is released, how do you feel

1   that might affect your daughter's pregnancy?

2   A.   Greatly.  I think it would because she would be in

3   fear that he might show up.  However, you know, I would

4   hope that he would not do that, but the simple reason

5   is -- I'll be honest with you and this is my feelings.

6   She's my daughter and I've had history of working those

7   cases because I was a law enforcement officer for over 25

8   years.  And some of these folks like that, you don't know

9   what's running through their mind at the time if they have

10  nothing to lose.

11          So yes, there's concern if he's released.  I do

12  have concern.  But I'll mitigate the appropriate things

13  here at my home if he is.

14  Q.   I pass the witness.

15          MS. HERRING:  No questions, your Honor.

16          THE COURT:  Thank you.

17          Mr. Thomison, you may be excused.  Thank you.

18          THE WITNESS:  Thank you.

19          THE COURT:  I'll go ahead and stop your video

20  now.

21          THE WITNESS:  Thank you.

22          THE COURT:  Of course, just to be clear, you can

23  remain and listen to the proceedings.

24          THE WITNESS:  Thank you, ma'am.

25          THE COURT:  Thank you.

1          Mr. Devlin, do you have any other additional

2    witnesses?

3          MR. DEVLIN:  We have no additional witnesses,

4    Judge, and no additional evidence.

5          THE COURT:  Okay.  Thank you.

6          Ms. Herring.

7          MS. HERRING:  I don't plan to call any witnesses,

8    your Honor.

9          THE COURT:  Okay.  So I think at this time, we

10   can proceed to argument.

11         MR. DEVLIN:  May I begin, Judge?

12         THE COURT:  Yes, sir.

13         MR. DEVLIN:  Thank you.

14         Well, first of all, I think that based on the

15   information in the complaint and the testimony of Agent

16   Moynihan, that there is probable cause to believe that

17   Defendant Grubert has committed the offense charged in the

18   complaint, advertising child pornography.

19         There's plenty of information there that talks

20   about how Website A was dedicated to child pornography.

21   He was a participant in that.  He was seen in videos,

22   committing activities.  And I won't speak about in any

23   further detail that has already come out in the testimony,

24   but he was clearly identified there in the videos.  He was

25   connected to a telephone number that was ultimately traced

1   to him that was also connected to another suspect who was

2   involved with the website.  So I believe that there's

3   plenty of information and evidence establishing probable

4   cause in this case.

5           In terms of the detention issue, Judge, we will

6   rely heavily on the presumption in this case.  We believe

7   that the nature of the offenses in this case, the fact

8   that there -- that there was, you know, some close contact

9   as described in the complaint with a very young child who

10  was depicted on video while defendant was observing it is

11  significant.

12          In addition, we also believe that the testimony

13  of Mr. Thomison in discussing the conversation that he had

14  with -- the conversation that Mr. Grubert had with his

15  wife that was related to Mr. Thomison about not being able

16  to promise that he would not do something sexually to a

17  child is extremely significant.  And I think that that is

18  probably a horrible example, but a good example, of why he

19  needs to be detained in this case.  And I think to some

20  extent, that probably also goes to probable cause: it's

21  consistent with his behavior on Website A.

22          In addition, while there has been -- there's been

23  evidence presented by Mr. Thomison that Mr. Grubert may be

24  a potential danger to himself.  And I know that that's not

25  specifically discussed in the law regarding the risk of

1    danger.  It's usually danger to others or the community.

2    But I would submit to you that it actually goes to both

3    factors that you need to consider both danger and risk of

4    flight.

5          The danger is that people who are threatening to

6    do this kind of thing often don't just restrict it to

7    themselves.  They -- if they're going to do something

8    harmful and certainly now with the nature and the

9    seriousness of the charge before the Court, he's going to

10    -- certainly there's a lot of motivation there to follow

11    through on those threats.  Even though those threats were

12    made in the past under other circumstances, their concern

13    is that there might be -- if he decides to harm himself,

14    for whatever reason, he might take somebody else with him,

15    or he might harm somebody else at the same time.

16          And so, I think in that sense, his inclination to

17    want to harm himself in the past has probably increased

18    significantly now that law enforcement has come to his

19    house, has seized evidence, and that now he's facing

20    extremely serious charges involving child pornography.

21          And so, I would ask that the Court consider that,

22    as well, as part of the danger to others.  While danger to

23    himself is not -- you know, I guess whatever he might do

24    to himself is probably not a great concern to what he

25    might do to others.  The fact is that these types of

1    things turn into situations where they want to affect

2    others, too, for whatever reason.

3           And in addition, the other factor in kind of an

4    unusual way would address his risk of nonappearance.

5    While there may not necessarily be a risk of flight that

6    he's actually going to flee and perhaps head to another

7    country, or head out of the jurisdiction, or anything

8    else, certainly there is a great risk of nonappearance not

9    only -- if he decides that he might try to harm himself or

10   harm others, and I think that that goes to that factor, as

11   well.

12          The defendant's wife is not willing to take him

13   back at this point nor are her parents, his in-laws, and

14   that should be a significant factor, too, for the Court to

15   consider.  That's huge.  She has move -- his wife has

16   moved out of their house.  I think that while that might

17   be available to him to go back to, there's no evidence

18   that he's going to be continued to be employed at this

19   point, in light of his arrest and the charges; and absent

20   that and absent any other possibility of gainful

21   employment, which hasn't been presented here, we believe

22   he might be probably in a position to be evicted from his

23   house and no longer be able to live there, anyway.

24          So there's been no evidence of that whatsoever.

25   And in the end, there's really been no evidence to

 1 | overcome the presumption to the satisfaction of the Court.
 2 | And based on the information in the complaint, Pretrial
 3 | Services report, as well as the testimony presented today,
 4 | we would ask that the Court detain this defendant pending
 5 | further proceedings in Boston.  Thank you.
 6 |             THE COURT:  Thank you, Mr. Devlin.
 7 |             Ms. Herring.
 8 |             MS. HERRING:  Yes, your Honor.  Thank you.
 9 |             First on the preliminary hearing argument, I
10 | think the Court has to consider before it what's in the
11 | redacted complaint.  And we were presented with an agent
12 | who didn't write that complaint and failed to explain many
13 | of the portions that I was curious about that remain
14 | redacted for me and for the Court.
15 |             I think the inability to explain what links Mr.
16 | Grubert, this user name, is critical.  The explanation
17 | that he's linked to the user name because he appeared in a
18 | video that had a file name that contained the user name is
19 | not sufficient evidence to link him to any of the activity
20 | referenced by the user name in the portions of the
21 | redacted complaint before the Court.
22 |             The agent was also unable to point to anything
23 | that Mr. Grubert actually did as an alleged staff member
24 | on the website, and I think that's critical for the Court
25 | to consider in the determination of whether there is

1   probable cause because he's not charged with possession of

2   child pornography.  The complaint talks about

3   advertisement, and, you know, that's not as frequent a

4   charge as we see in Austin, but that's knowingly makes or

5   publishes any notice or advertisement seeking or offering

6   to receive, exchange, buy, produce, display any visual

7   depiction involving sexually explicit conduct by a minor.

8   There was no testimony by that agent, and there is

9   insufficient evidence in the unredacted portions of the

10  complaint, that provide the Court with evidence to find

11  probable cause on an advertisement of child pornography

12  charged.

13          So I would urge the Court to consider whether

14  there is sufficient evidence presented today and the

15  decision not to call the agent with any actual knowledge

16  and to take into account what it is this complaint is

17  about.  We heard no evidence of Mr. Grubert's specific

18  involvement in any of the actions that the statute lists

19  as conduct makes someone culpable of advertisement of

20  child pornography.

21          Moving on to my argument on detention, the

22  Pretrial Services report is in evidence.  The government

23  proffered that, and we agree with its admission and

24  consideration by the Court.  It's a presumption case, but

25  in a presumption case, the defendant only has to produce

1   some credible evidence showing he's not a flight risk and

2   not a danger to the community.

3        The Fifth Circuit has made clear that the

4   presumption shifts to the defendant a burden of

5   production, but not a burden of persuasion.  And the Fifth

6   Circuit has also found that the Pretrial Services report

7   can be sufficient credible evidence to carry that burden.

8   He does not have the burden of persuasion here.  It's just

9   the production of some credible evidence.

10       And the Pretrial Services report in this case is

11  strong evidence that Mr. Grubert is not a flight risk, and

12  he's not a danger to the public or to the community.  And

13  the Court has the ability to set conditions that

14  reasonably assure -- which is all the Court has to do --

15  reasonable assure his appearance and reasonably protect

16  the public.

17       I think the government as much as conceded

18  there's not a risk of flight here.  This insinuation that

19  there's a risk of nonappearance due to a fear of suicide

20  is not at all what was contemplated by the Bail Reform Act

21  when it calls upon a court to consider risk of flight.

22  Risk of flight has to be more than ordinary flight.  There

23  is no evidence that Mr. Grubert is going to flee here.

24       The Pretrial Services report has strong evidence

25  that he has ties to this community.  He's a lifelong Texas

1  resident.  He grew up in the same area of Texas in which

2  he lives now.  He's traveled out of the country one time

3  on his honeymoon to Mexico.  He can turn in his passport

4  to the Court.  He's someone -- I think it's really rare do

5  we see someone who's held the same job for eight years.

6  That's evidence that he shows up, that he can keep

7  commitments.  He's got a solid work history.

8        And I -- although the agent couldn't testify to

9  it because she was only involved for a month, the portions

10 of the complaint that we do have indicate there has been

11 investigation into Mr. Grubert for some time.  I don't

12 know how much time, but I think the government's decision

13 to not pursue him, you know, immediately whenever that

14 investigation began is further indication that there

15 wasn't a fear that he would flee.

16        And certainly through home detention, through

17 GPS, the Court can set conditions that assure his

18 appearance in court.  And I can say I spoke to his mother

19 this morning, Rayna Halliburton.  She's also listening on

20 the call, but she lives in a sort of sparsely populated

21 lakeside community.  She lives on a half-acre property.

22 There are trees that separate her lot from the lots of her

23 neighbors, and there's not even a clear sight line between

24 the homes.  And she's a fairly solitary person and is

25 willing to have him in the home, willing to have the home

1  with no internet.  And I've spoken, of course, to Mr.

2  Grubert, as, well, and he understands that that would be a

3  condition he would have to comply with.

4       Moving to the need to protect the public, the

5  government has to show that Mr. Grubert presents a danger,

6  not that he, in theory, as a Tor user poses a danger.  And

7  Mr. Grubert is someone with no criminal history, not even

8  a prior arrest, which, again, is not something the Court

9  is frequently presented with.  He's not a drug user,

10 doesn't have a history of drug use or abuse.

11      And I think the government's main argument rests

12 on this involvement in the Tor website and this

13 generalized presentation of his involvement with a child

14 pornography website.  No evidence he's ever had contact

15 with a living child, no history of contact offenses.  This

16 is an online offense.  There was no presentation of any

17 concern about violence.

18      I certainly understand Mr. Thomison's concerns

19 for his family and for his daughter, but those concerns

20 are for an unborn child that is not due until January

21 2021.  And a concern that Mr. Grubert would hurt not the

22 public but himself and Mr. Thomison testified that he --

23 if Mr. Grubert were released, he could take appropriate

24 measures to protect his home.  And the government's

25 concerns for Mr. Grubert's mental health seem largely

1   speculative.

2       But to the extent there are concerns for mental

3   health that go along with being under indictment for a

4   very serious charge, Pretrial Services deals with that in

5   almost every case that they handle, and they have specific

6   -- there's a specific program or counsel that someone can

7   meet with in CP cases specifically to analyze how the

8   person is doing under the mental stress of being under a

9   charge or indictment for this kind of case.  So the danger

10  the government argues for here is not specific to Mr.

11  Grubert.

12       I found a case that I think is pretty

13  instructive.  It's a Fifth Circuit case called, United

14  States vs. Jackson, which I can give the site to, but it

15  was a meth case where the man was part of the Bandidos

16  Motorcycle Club.  And so, the government offered extensive

17  evidence about all of the illicit activities committed by

18  the Bandidos Motorcycle Club.  Reading from the case, they

19  presented evidence of the defendant's membership in a

20  nationwide organization capable of hiding fugitives and

21  all of these other things that the Bandidos were involved

22  in.

23       And it was a presumption case, it was a drug

24  case, and the Fifth Circuit said, well, the agent who

25  testified clearly knew a lot about the Bandidos motorcycle

1   organization, but could identify no evidence that the

2   government had concerning the specific defendant's

3   involvement in the manufacture of the drugs in that case.

4   And the Court held that the government cannot reasonably

5   argue that the presumption, coupled with allegations

6   contained in the indictment, are sufficient to satisfy

7   3142(g) for the Court to detain, in that case, Mr.

8   Jackson.

9          So the government has said its heaviest factor,

10   its weightiest factor before the Court is the presumption.

11   I do not believe -- I believe we've rebutted it in terms

12   of the burden of production.  And the Pretrial Services

13   report makes very clear that Mr. Grubert has a place to go

14   unrelated to his wife and his in-laws, and he can comply

15   with any conditions the Court can, set, and release should

16   be authorized in this case.  Thank you.

17          MR. DEVLIN:  Judge, may I --

18          THE COURT:  Ms. Herring, I would just ask that

19   the case that you were referring to, U.S. vs. Jackson,

20   could you please go ahead and give me that site?

21          MS. HERRING:  Yes, your Honor.

22          It is 845 F. 2d 1262 and it's the Fifth Circuit

23   from 1988.

24          THE COURT:  Thank you very much.

25          Mr. Devlin.

1          MR. DEVLIN:  Judge, if I may just to respond
2   briefly, I do want to address the elements of advertising,
3   and first -- there's basically three elements.  The first
4   element is that the defendant either knowingly made,
5   printed, or published a notice or advertisement; secondly,
6   the notice or advertisement had to have sought or offered
7   to receive, exchange, buy, produce, or would perhaps maybe
8   more pertinent in this case, to display or distribute or
9   reproduce any visual depiction, the production of which
10  utilize a minor engaging in sexually explicit conduct and
11  such visual depiction is of such conduct.  In other words,
12  child pornography.

13          And then, the third element is the interstate
14  nexus, which is defendant knew or had reason to know that
15  the notice or advertisement would be transported in
16  interstate commerce, or the notice or advertisement was
17  transported in interstate commerce.  And I think that that
18  element is pretty self-explanatory being on the Tor
19  network and the nature of the internet being interstate
20  commerce.  So the publishing of the notice and the notice
21  offering to display or distribute child pornography is the
22  crux of the offense here.

23          And I believe that we have sufficient evidence of
24  that, especially as laid out in the complaint but, also,
25  through the testimony of Agent Moynihan.  Judge, posts on

 1   bulletin boards in child pornography sites have been held

 2   to constitute advertisements.  And one case that I will

 3   cite -- or couple of cases is, United States vs. Grovo,

 4   G-R-O-V-O, at 826 F. 3d 1207.  It's a Ninth Circuit case

 5   from 2016.

 6          Another case supporting that proposition is,

 7   United States vs. Franklin, at 785 F. 3d 1365, and that's

 8   a Tenth Circuit case from 2015.

 9          And finally -- it's not finally.  I've got a

10   couple more -- United States vs. Wayerski,

11   W-A-Y-E-R-S-K-I, at 624 F. 3d 1342, an Eleventh Circuit

12   case from 2010.

13          And United States vs. Rowe, R-O-W-E, 414 F. 3d

14   271, a Second Circuit case from 2005.

15          All of those have held that posts on bulletin

16   boards or child pornography sites have been held to

17   constitute a notice or advertisement, and that isn't a

18   charge that we do often here in Austin.  It is done in

19   other districts, including Massachusetts, and it's a

20   fairly straightforward and simple charge.

21          But again, in light of the nature of Website A,

22   and in light of the postings that were done there, the

23   postings set forth in the redacted complaint, we believe

24   that there is more than sufficient evidence to establish

25   that this constituted advertisement of child pornography,

1   and so, I wanted to address that.

2           The other thing I wanted to address, too, in

3   terms of danger to the community, is the potential

4   obstruction of justice that we believe could occur if this

5   defendant is released.  His involvement in the -- with the

6   Tor browser, with the dark web, and with this website

7   indicates a level of fairly sophisticated computer use.

8   And since this is ongoing investigation, this website is

9   still active, we're extremely concerned that he is going

10  to get on there and warn others and tell them to destroy

11  their evidence, and what have you, and I think that that

12  does constitute a danger to the community.  It's going to

13  prevent other people who are involved in these kinds of

14  activities perhaps from being found out or caught, and

15  that should be considered by the Court as an element of

16  the danger to the community.

17          And again, as Agent Moynihan testified, the --

18  there was a concern in executing the warrant beforehand

19  that this defendant would delete data, would advise users

20  to delete data, and would otherwise obstruct justice by --

21  and that's why they wanted to go in with a no-knock

22  warrant, and that was justified to the Court.  And as it

23  turned out, that was -- even that did not prevent things

24  from being password-protected and otherwise secured by the

25  defendant to the point that law enforcement here is going

```
1   to have a tough time getting into things.

2            And so, once -- if he is released and he gets out

3   and he starts doing that, it's going to significantly

4   jeopardize the ongoing investigation.  And we would submit

5   that that is another factor to consider for danger to the

6   community.

7            So that's all I have to add, Judge.  We believe

8   that there's sufficient probable cause here and, also,

9   that the defendant should be detained pending further

10  proceedings.

11           Thank you.

12           THE COURT:  Thank you.

13           Well, at this time, I'd like to take a recess.  I

14  know that it's late in the afternoon, but both counsel

15  have given me some cases to take a look at, and I'd like

16  to confer with Pretrial Services.  So I will leave the

17  meeting.  We'll leave it on, but probably be back in 15 to

18  20 minutes.  So the Court's in recess for now.

19           Did it look like -- Mr. Grubert, was there

20  something that -- he's raising his --

21           THE DEFENDANT:  Speak with Ms. Herring for a

22  moment.

23           THE COURT:  I -- we could take a few, Ms.

24  Herring.  Is this a time that you would like to speak with

25  Mr. Grubert privately?
```

 1            MS. HERRING:  If he's asking to, then yes.  Yes,

 2    your Honor, if it's possible for James to move us quickly

 3    to a separate breakout room, I guess they call it?

 4            THE COURT:  Yes.  And I think either Mr. Ferrell

 5    or I can do that, although I suspect he's better at it

 6    than I am.

 7            Mr. Ferrell, are you able to move Ms. Herring and

 8    her client to a breakout room at this time?

 9            THE CLERK:  Attempting to now.

10            THE COURT:  Okay.  Thank you.

11            Then I will also step away for just a moment and

12    return.

13            (Proceedings recess at 4:35 p.m.

14             and resume at 4:54 p.m.)

15            THE COURT:  I'd like to start to thank the

16    participants, everyone, the testimony, witnesses who

17    testified.  Mr. Devlin, and, Ms. Herring, I'd like to

18    thank you for your particularly powerful and persuasive

19    arguments.  I find this to be a very difficult case.  And

20    I appreciate the cases that both of you cited to me.  I

21    was able to review those during the time I was in recess.

22            And I wanted to clarify for the record, also,

23    because I wasn't clear on that earlier.  There was a

24    question whether the Court had received the unredacted

25    complaint, and I was able to verify that the Court has

1  not.  I did not rely on the unredacted complaint and don't

2  have it.

3       So considering first the preliminary hearing, I

4  do find that the testimony of Agent Moynihan was credible

5  and reliable in that there's sufficient evidence to

6  establish that there's probable cause to believe that the

7  offense of advertisement of child pornography has been

8  committed.  And let me just to be clear, excuse me, I want

9  the make sure I have the title right.  The advertising of

10  child pornography has been committed and that the

11  defendant committed it so that he'll be required to appear

12  for further proceedings.

13       So turning to the detention portion of the

14  hearing, under the Bail Reform Act, there's defendant must

15  be released before trial unless I find that no condition

16  or combinations exist that will reasonably assure the

17  appearance of Mr. Grubert.  If the government seeks

18  detention risk on the basis of flight or reasonably assure

19  the safety of any other person in the community, if the

20  government seeks detention based on the defendant's danger

21  to the community.  Here, the government, I believe, has

22  moved on both prongs.

23       This is a rebuttable presumption case, that

24  there's a rebuttable presumption of detention, and I do

25  find that the presumption has not been rebutted in this

 1    case.  Considering the four factors under the Bail Reform

 2    Act that I'm required to apply, which are the nature and

 3    circumstances of the alleged offense, the weight of

 4    evidence against the defendant, your history and

 5    characters, and the nature and seriousness of the danger

 6    to others or the community, I've considered the evidence

 7    presented as to all four of those factors and, also, the

 8    recommendation of Pretrial Services, which in this case is

 9    detention pending trial.

10          And I am particularly persuaded as to the fourth

11    factor.  And I will say, I will issue a written order that

12    will go into more detail, but I think the nature and

13    seriousness of the danger to others or the community, I

14    thought while I appreciate very much Ms. Halliburton's

15    offer to act as a custodian for Mr. Grubert, I think it

16    would be extremely difficult.  And even reviewing the

17    Pretrial Services has proposed numerous, onerous and very

18    strict conditions for Mr. Grubert's release, I am not

19    convinced that they could protect -- be protective of the

20    internet type of activity that forms the nature of the

21    charge.

22          And also, I found Mr. Thomison's testimony

23    particularly powerful as to the nature and seriousness of

24    the danger to Ms. Grubert, to his daughter.

25          So considering all of the evidence, I will be

1  ordering that you be detained pending trial, Mr. Grubert.

2  And if there's -- is there anything else that we need to

3  address today, Mr. Devlin?

4          MR. DEVLIN:  No, there's not, Judge.  Thank you.

5          THE COURT:  Ms. Herring?

6          MS. HERRING:  Judge, I just think entry of the

7  transfer order, as well, so that he can get to Boston as

8  soon as possible through marshals transport.

9          THE COURT:  Okay.  Yes.  Thank you.  We will do

10 that.  We'll enter that order.

11         Mr. Ferrell, is there anything else that we need

12 to address before we adjourn today?

13         THE CLERK:  No, your Honor.

14         THE COURT:  Okay.  Once again, thank you to

15 everyone and the Court is adjourned.

16         (Proceedings conclude at 4:58 p.m.)

17

18

19

20

21

22

23

24

25

```
 1

 2

 3                    REPORTER'S CERTIFICATE

 4

 5      I, LILY I. REZNIK, DO HEREBY CERTIFY THAT THE FOREGOING

 6   WAS TRANSCRIBED FROM AN ELECTRONIC RECORDING MADE AT THE

 7   TIME OF THE AFORESAID PROCEEDINGS AND IS A CORRECT

 8   TRANSCRIPT, TO THE BEST OF MY ABILITY, MADE FROM THE

 9   PROCEEDINGS IN THE ABOVE-ENTITLED MATTER, AND THAT THE

10   TRANSCRIPT FEES AND FORMAT COMPLY WITH THOSE PRESCRIBED BY

11   THE COURT AND JUDICIAL CONFERENCE OF THE UNITED STATES.

12

13   /s/Lily I. Reznik                    August 10, 2020

14   LILY I. REZNIK, CRR, RMR             DATE
     Official Court Reporter
15   United States District Court
     Austin Division
16   501 W. 5th Street, Suite 4153
     Austin, Texas 78701
17   (512)391-8792
     SOT Certification No. 4481
18   Expires:  1-31-21

19

20

21

22

23

24

25
```