UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No: 21-cr-10001-NMG |
| | ) | |
| NEAL GRUBERT, | ) | ***LEAVE TO FILE REPLY*** |
| Defendant. | ) | ***GRANTED ON 5/3/22*** |

### DEFENDANT'S REPLY TO GOVERNMENT'S OPPOSITION TO HIS MOTION TO SUPPRESS STATEMENTS

Defendant Neal Grubert submits this Reply to the Government's Opposition to Defendant's Motion to Suppress to respond to, and more fulsomely address, two specific areas of the government's opposition: (1) that Mr. Grubert was subject to custodial interrogation; and (2) that the agents failed to scrupulously honor Mr. Grubert's invocations of his right to remain silent. His statements, therefore, must be suppressed.

### I.   Mr. Grubert Was Subject To Custodial Interrogation

In asserting that Mr. Grubert was not in custody when he spoke with law enforcement in his home, the government misstates the legal standard for custody, and ignores central factors both that bear on custody determinations and that distinguish this case from cases it cites to support its position. *See* Gov't Opp., D.E. #s 68-69 ("Opp.") at 5-6.

The government incorrectly states that the analysis of whether a defendant is in custody is "whether a reasonable person in the defendant's shoes would feel at liberty to terminate the interrogation." Opp. at 5. This statement omits a critical – and here, fatal – factor. The correct standard is whether a reasonable person in the defendant's shoes would feel at liberty to terminate the interrogation *and leave or cause the officers to leave. United States v. Infante*, 701 F.3d 386, 396 (1st Cir. 2021). *See also United States v. Mittel-Carey*, 493 F.3d 36, 39 (1st Cir. 2007) *quoting*

1

*Thompson v. Keohane,* 516 U.S. 99, 112 (1995) ("This inquiry is informed by considering the 'totality of the circumstances,' *id.*, and asking whether in light of the circumstances of the interrogation, 'a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave'"). As discussed below, factors bearing on the freedom to leave are essential to the analysis of whether a defendant is in custody.

The government dismisses the impact that breaking down a defendant's door, causing considerable damage to his home, launching flash-bang grenades, bringing him to the floor, and handcuffing and bringing him into a police car might have on a reasonable person's belief concerning whether he was free to terminate an interrogation and leave, or have the officers leave. The government does not dispute any of the facts stated in Mr. Grubert's Motion to Suppress, but instead claims that Mr. Grubert "felt comfortable discussing" these facts with the agents. Opp. At 6. This contention is inapposite. First, as the government acknowledges, the analysis is an objective rather than subjective one; any alleged feeling of comfort is not relevant. Second, an apparently even-tempered discussion of the agents' violent entrance can bespeak an attempt in light of that violent entrance to use the only reasonable means available to prevent further damaging behavior, rather than any comfort. As Mr. Grubert remarked to Agent Squire "…y'all have got a small army." Mot. Sealed Exh. 2b at 26.

The government cites the fact that the agents took steps to make sure Mr. Grubert's cat was safe as evidence that the encounter was non-custodial. Opp. At 7. What actually transpired is, rather, evidence that it was custodial. Mr. Grubert asked if his cat could be put into a room behind a door because it had never been outside. Mot. Sealed Exh. 2b at 2. Rather than permit Mr. Grubert to get up from the table and tend to the cat or permit Mr. Grubert to be unaccompanied for a mere

2

moment, Agent Squire asked Agent Moynihan to sit with Mr. Grubert while Squire tended to the cat. *Id.* at 2-3.

In its reliance on certain cases in which courts found custody was not established, the government cherry-picks individual factors shared by Mr. Grubert's case and one or more of the other cases. Opp. at 5-7. These cases, however, contain significant facts indicating a lack of custody which are missing here, and/or completely lack the show of force in this case. For example, there is a glaring distinction between Mr. Grubert's case and *United States v. Guerrier*, 669 F.3d 1 (1st Cir. 2011); *United States v. Infante*, 701 F.3d 386 (1st Cir. 2012); *United States v. Hughes,* 640 F.3d 428 (1st Cir. 2011), and *United States v. Gonzalez*, 814 F.App'x 838 (5th Cir. 2020). In each of these cases, the defendant was explicitly told that he was not under arrest, and/or not in custody and/or free to leave. There was no such statement or assurance made to Mr. Grubert here. This is of major significance in assessing whether a reasonable person would believe that he was free to terminate questioning and leave. In a similar vein, in *United States v. Crooker*, 688 F.3d 1 (1st Cir. 2012), the defendant was permitted to move freely about his property, even leaving it for some time after he was questioned.

None of the above cases cited by the government contained the show of force involved here. In *United States v. Lanni*, 951 F.2d 440(1st Cir. 1991), in a determination that the First Circuit described as "close", there was no forceful entry or use of handcuffs involved. Likewise, there was no force or handcuffs used in *United States v. Beckwith,* 425 U.S. 341, 343 (1976), a case in which, unlike here, the defendant was permitted to excuse himself to finish dressing.

The government, citing *Crooker* and *Hughes* as support, further argues that because only two agents participated in Mr. Grubert's questioning, the fact that fifteen agents were present does not affect the custody analysis. Opp. at 6. In *Crooker*, however, despite the number of agents on

the premises, the defendant was permitted to move about freely and in fact to leave. *Hughes* involved only four agents; here there were fifteen. The government does not explain how the analysis in *Mittel-Carey,* in which the First Circuit found custody where eight agents entered the defendant's home, but only two participated in the questioning, can be ignored.

In *Mittel-Carey*, the government argued that physical control of the scene with multiple agents was necessary to preserve evidence within the house and protect officer safety. *Mittel-Carey*, 493 F.3d at 40. The court responded that while that may have been true, the need for preservation and protection is very different from whether a reasonable person would believe he could terminate the interrogation and leave. *Id.* The Ninth Circuit, in a decision that cites *Mittel-Cary*, explained the effect on a reasonable person's belief that he is free to terminate an interrogation or leave when there is a large police presence in a home, even where only two officers participated in interrogation:

> When a large number of law enforcement personnel enter a suspect's home, they may fill the home such that there are no police-free rooms or spaces to which the suspect may retreat should he wish to terminate the interrogation. Similarly, when the number of law enforcement personnel far outnumber the suspect, the suspect may reasonably believe that, should he attempt to leave, he will be stopped by one of the many officers he will encounter on the way out.

*United States v. Craighead*, 539 F.3d 1073, 1084-85 (9th Cir. 2008).

For these reasons and for the reasons stated in his Motion to Suppress, Mr. Grubert was subject to custodial interrogation.

## II. The Agents Failed To Scrupulously Honor Mr. Grubert's Invocations Of His Right To Remain Silent

The government contends that the agents did not fail to scrupulously honor Mr. Grubert's invocation of the right to remain silent. In doing so, it misconstrues the focus of analysis for such

4

failures, ignores important considerations about the permissible scope, timing, and content of invocations, and ignores key indicia for lack of scrupulousness.

The government begins its analysis by describing the conditions for a valid *Miranda* waiver, noting that the validity of any such waiver depends upon a determination that the waiver was knowing and intelligent and uncoerced. Opp. at 8. It then argues that Mr. Grubert did not unambiguously invoke his right to remain silent, stating that the passages Grubert cites to show invocation do not demonstrate unambiguous invocation, but rather that "the defendant was both keenly aware of and in control of the limits he was able to set during the conversation with his agents." Opp. at 9. The government comments that "[i]t can fairly be said that this is precisely the point of *Miranda* warnings."  It goes on to say that Mr. Grubert "demonstrated throughout the interview that he was curious about what [the agents] actually knew and that he was aware of the potential consequences of saying much *beyond* what they already knew." Opp. at 10, emphasis in original.

Determinations of whether a defendant's invocation of a right to silence was scrupulously honored, however, do not hinge on the degree of a defendant's awareness of and control over his right to remain silent. Whereas the validity of a waiver of Miranda rights depends upon whether the waiver was knowing, intelligent, and uncoerced, the question of whether an invocation of the right to silence was scrupulously honored focuses on the behavior of agents. The First Circuit has clearly explained that the test for whether agents scrupulously honored an invocation does not focus on the voluntariness of a defendant's subsequent statements in *United States v. Barone,* 968 F.2d 1378, 1383 (1st Cir. 1992).

> The traditional examination into whether a defendant voluntarily, knowingly and intelligently waived his or her Fifth Amendment rights occurs when a suspect, after receiving the *Miranda* warnings, makes a confession. The scrutiny in such instances is broad, encompassing not only the nature of the police conduct but also such factors as the

5

> suspect's age, education and past criminal experience, and whether the suspect had the capacity to understand both the warnings given him and the consequences of waiving his rights. *See, e.g., Fare* v. *Michael C.,* 442 U.S. 707, 724-27, 61 L. Ed. 2d 197, 99 S. Ct. 2560 (1979); *United States* v. *Melanson,* 691 F.2d 579, 588 (1st Cir. 1981).
>
> While the suspect's state of mind is central to the voluntariness finding, the *Mosley* test focuses on what the police did, and when, after the suspect exercised his or her right to remain silent. Indeed, the *Miranda-Mosley* rules are designed to give law enforcement agencies and courts "clear, objective standards that might be applied to avoid the vagaries of the traditional voluntariness test," *Mosley,* 423 U.S. at 113 (Brennan, J., dissenting).

*Id*. at 1384.

The government argues that Mr. Grubert's invocations were not unambiguous. Opp. at 9. As argued in the Motion to Suppress, however, a suspect need not speak with the discrimination of an Oxford don to invoke the right to silence. *See United States v. Reid*, 211 F. Supp. 2d 366, 374 (D. Mass. 2002). Nonetheless, Mr. Grubert's repeated statements to agents were clear invocations of the right to remain silent about select topics. For example, he said "I don't give out passwords . . . I am not givin' out no passwords" (Mot. Sealed Exh 2(b) 36-37); "I don't want to be sitting at this table at all . . . I just want to be quiet. I have almost nothing to say . . . y'all are actually adversarially here" (*Id.* at 40-41); "I still have seen no judge. I'm still just as innocent as both of you. So until I … Really, the thing is, is, I mean I d—I don't – I'm not gonna say much more than what I would say to my friend down the street than that. I have nothing else. That's all I have." (*Id.* at 46).

The government refers to the interrogation context before and after Mr. Grubert's "pinpoint cites" as demonstrating defendant's awareness of his rights. Opp. at 9. But, again, Mr. Grubert's awareness of his rights is not the focus of the analysis in this context. He clearly invoked his right to silence on topics other than general computing and Tor. A defendant's earlier statement, moreover, does not negate a later invocation of the right. Nor, as here, does the willingness to talk about some subjects (such as computing in general or Tor) negate the invocation of the right to

silence as to others. "Through the exercise of his option to terminate questioning [a suspect] can control *the time at which questioning occurs, the subjects discussed*, and the duration of the interrogation. *Michigan v. Mosley*, 423 U.S. 96, 103–04 (1975) (emphasis added). Moreover, a later statement cannot be used to argue for the ambiguity of an earlier statement. Once invoked, the government cannot use subsequent statements to agents to "cast retrospective doubt on the clarity of the initial request itself." *Smith v. Illinois*, 469 U.S. 91, 98-99 (1984).

Agent Squire did not, as required, cease questioning regarding certain topics that Mr. Grubert said he would not talk about. Instead, Squire immediately questioned him about why he would not talk about them, informed him that they knew a lot already, that speaking would be no detriment and no embarrassment, and suggested that it would be important as a 31- or 32-year-old man to accept responsibility for what happened. Mot. Sealed Exh. 2b 40-45.

Rather than address the impropriety of Squire's conduct, the government in its opposition again wrongly focuses on Mr. Grubert's state of mind rather than the agent's actions. It says that Mr. Grubert's will was not being overborne by overzealous agents, but rather, he made knowing decisions about what to say in response to non-coercive questions. Opp. at 11. The government thus ignores facts that *do* bear on the analysis of scrupulousness. For example, it ignores the fact that, as Mr. Grubert argued in his Motion to Suppress, questioning by the agents proceeded immediately and continuously after Grubert expressed that he was unwilling to talk about a subject. This is a primary factor considered by courts in this context. *United States v. Lara Lara*, 440 F. Supp. 3d 64, 70 (D. Mass. 2020).

The government also ignores the fact that, as argued in the Motion to Suppress, the agents used "words or actions . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *United States v. Thongsophaporn*, 503 F.3d 51, 57 (1st

7

Cir. 2007). Squire repeatedly spoke of what Grubert could say to his wife if he helped, said that he could save a child in danger and that Squire knew that Grubert, like most people, didn't want to see a child hurt, that time was of the essence in doing this so that waiting for a lawyer or court would not be helpful, that it would be on his conscience if he didn't, that the question for him was whether as a 32-year-old man, he would take responsibility for what he had done, and how cooperating now rather than later could be beneficial to him.

For the reasons stated above and in his Motion to Suppress, the agents did not scrupulously honor Mr. Grubert's invocation of his right to silence.

## Conclusion

For the foregoing reasons and for those stated in the Motion to Suppress, HSI Agents Squire and Moynihan failed to scrupulously honor Mr. Grubert's invocation of his right to remain silent. Mr. Grubert moves that the Court grant his motion to suppress statements made as a result of the agent's unlawful conduct.

Respectfully submitted,
NEAL GRUBERT
By His Attorney,

*/s/ Sandra Gant*
Sandra Gant, B.B.O.# 680122
Federal Public Defender Office
51 Sleeper Street, 5th Floor
Boston, MA 02210
Tel: 617-223-8061

CERTIFICATE OF SERVICE

I, Sandra Gant, hereby certify that this document filed through the ECF system will be sent electronically to the registered participant(s) as identified on the Notice of Electronic Filing (NEF) on May 10, 2022.

/s/ *Sandra Gant*
Sandra Gant