United States District Court

District of Massachusetts

|  |  |  |
|---|---|---|
| United States of America | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Neal Grubert, | ) | |
| | ) | Criminal Action No. |
| Defendant. | ) | 21-10001-NMG |
| | ) | |

**MEMORANDUM & ORDER**

**Gorton, J.**

In July, 2020, federal agents executed a search warrant of the residence of defendant Neal Grubert ("Grubert" or "defendant") in connection with an investigation into the advertisement of child pornography on a website referred to as "Website A". After the execution of the warrant, Grubert gave an approximately two-and-a-half-hour-long interview to two agents, in which he made allegedly incriminating statements. He now moves to suppress those statements, alleging that the arresting officers did not scrupulously honor his Miranda rights.

For the reasons that follow, defendant's motion to suppress (Docket No. 63) will be denied.

I.  **Motion to Suppress**

   **A. Legal Standard**

   The Fifth Amendment to the United States Constitution protects against compelled self-incrimination. U.S. Const. amend. V.  Its ambit extends, however, only to custodial settings and, therefore, the threshold question in any self-incrimination inquiry is whether suspect was in custody at the time the statements at issue were made. J.D.B. v. North Carolina, 564 U.S. 261, 270 (2011) (citing Stansbury v. California, 511 U.S. 318, 322 (1994) (per curiam)); United States v. O'Neal, 17 F.4th 236, 240 (1st Cir. 2021) (explaining that the "pivotal question" is whether suspect was in custody).

   Custody encompasses formal arrests and situations which a reasonable person would understand to be comparable. United States v. Guerrier, 669 F.3d 1, 6 (1st Cir. 2011); United States v. Hughes, 640 F.3d 428, 435 (1st Cir. 2011).  In determining whether a situation was comparable to a formal arrest, the Court undertakes a two-step analysis, first inquiring whether, in light of the objective circumstances, a reasonable person would have felt free to terminate the interrogation and leave and then considering whether the environment presented the same "inherently coercive pressures" as the type of stationhouse questioning at issue in Miranda. United States v. Melo, 954 F.3d 334, 339-40 (1st Cir. 2020) (quoting Howes v. Fields, 565 U.S.

499, 509 (2012)). The suspect is considered to have been in de facto custody only if an affirmative answer is produced at both steps. Id. at 340.

The First Circuit Court of Appeals ("the First Circuit") has identified four factors that bear upon the first step of the custodial inquiry, namely: 1) whether the suspect was questioned in familiar or neutral surroundings, 2) the number of law enforcement officers present at the scene, 3) the degree of physical restraint and 4) the duration and character of the interrogation. United States v. Trueber, 238 F.3d 79, 93 (1st Cir. 2001). While of particular relevance, those factors are not exhaustive of the relevant considerations, which the Court must examine in their totality. United States v. Mittel-Carey, 493 F.3d 36, 39 (1st Cir. 2007); Hughes, 640 F.3d at 438. In doing so, it must view the facts through an objective lens, without regard to the subjective estimations of the parties. United States v. Cruz-Rivera, 14 F.4th 32, 47-48 (quoting Melo, 954 F.3d at 340).

At the second step of the inquiry, the focus shifts to whether the interrogative environment imposed "enough pressure" on the suspect to "sufficiently impair his free exercise of privilege against self-incrimination". Id. at 50 (citing United States v. Ellison, 632 F.3d 727, 729 (1st Cir. 2010). The interrogation must possess a "coercive element" converting the

questioning into something "more draconian" than mere inquiry. Id. (quoting United States v. Fornia-Castillo, 408 F.3d 52, 65 (1st Cir. 2005)).  A want of freedom to leave is necessary, but not sufficient, to support a finding that a suspect was in custody. Howes 565 U.S. at 509.

If the suspect is found to have been in custody, either formally or as a product of his circumstances, the suppression inquiry then turns to whether law enforcement officers complied with the Fifth Amendment's procedural safeguards as expressed in Miranda v. Arizona, 384 U.S. 436 (1966), and subsequent cases. A criminal suspect must be informed of his right to remain silent and his right to counsel. Id. at 444.  The suspect may, however, waive those rights and converse with law enforcement officers. North Carolina v. Butler, 441 U.S. 369, 373-74 (1979). The government must prove that the waiver was knowing, intelligent and voluntary by a preponderance of the evidence. Colorado v. Connelly, 479 U.S. 157, 168 (1986).

If at any point after an initial waiver the suspect unambiguously asserts his right to remain silent or his right to counsel, the officers' questioning must cease. Berghuis v. Thompkins, 560 U.S. 370, 387-88 (2010) (explaining that "[a]ny waiver, express or implied, may be contradicted by an invocation at any time"); Davis v. United States, 512 U.S. 452, 459 (1994). An invocation of either right is "unambiguous" if a reasonable

-4-

officer under the circumstances would have understood that the suspect intended to invoke his Fifth Amendment rights. Davis, 512 U.S. at 459.  That invocation need not necessarily be comprehensive, however, and a suspect may exercise his Miranda rights with respect to some subjects but not others. Michigan v. Mosley, 423 U.S. 96, 103-04 (1975) (explaining that a suspect, through the exercise of his "option to terminate questioning" may control, inter alia, "the subjects discussed").

### B. Application

The material facts and circumstances concerning the execution of the search warrant of Grubert's residence are undisputed.  At approximately 10:30 p.m. on July 2, 2020, 15 federal agents from the Department of Homeland Security ("DHS") executed a search warrant at the defendant's residence.  They forcibly entered without knocking, deployed flashbang grenades, handcuffed Grubert and removed him from the premises.[1]  Grubert was then held, in handcuffs, in a police vehicle for approximately one hour before DHS agents Greg Squire ("Agent Squire") and Caitlin Moynihan ("Agent Moynihan") brought him back inside, informed him of his Miranda rights and commenced a

---

[1] The warrant allowed the unannounced, or "no-knock", nighttime entry due to concerns, apparently well-founded, that upon becoming aware of law enforcement's presence the defendant would activate software on his computer making it difficult or impossible to search.

conversation which ultimately continued for two-plus hours. At some point prior to that conversation the handcuffs were removed. Grubert remained, however, in a state of partial undress for its duration.

The content of the conversation, which was recorded, is also undisputed and is discussed in greater detail below. The parties diverge, however, with respect to 1) whether Grubert was in custody, 2) whether he invoked his constitutional right to remain silent and 3) whether agents Squire and Moynihan honored any such invocation.

### 1. Custody

Grubert asserts that he was in custody during his conversation with Agents Squire and Moynihan. He contends that no reasonable person would have believed himself at liberty to terminate the interrogation in light of, inter alia, the agents' forcible entry into his home and the hour-long, handcuffed detention in the back of a police cruiser that he had just endured. The government disagrees and submits that the custodial factors and the totality of the circumstances militate against finding that Grubert was in custody.

At the first step of the custody inquiry the Court considers the four custodial factors along with all other relevant facts and circumstances. Trueber, 238 F.3d at 93. On the whole, it agrees with Grubert's position.

-6-

Although Grubert and the agents conversed in his residence, any "margin of comfort" that he may have derived from the familiar setting pales in importance to the DHS agents' "dominat[ion of] the scene". Mittel-Carey, 493 F.3d at 40 (quoting, respectively, United States v. Griffin, 992 F.2d 1343, 1354-55 (8th Cir. 1990) and Sprosty v. Buchler, 79 F.3d 635, 641 (7th Cir. 1996), cert. denied, 519 U.S. 854 (1996)). An overwhelming number of DHS agents entered Grubert's residence by force at night and handcuffed him. See id. (noting the time of the search and the force used). While he was not physically restrained during the interview, other indicia of control abound. Grubert was not initially permitted to talk to his wife when she returned to their residence. See id. (observing that suspect, found to be in custody, was not allowed to talk to his girlfriend). When he wanted water or to use the bathroom, he asked Agents Squire and Moynihan for permission. Compare id. (noting that suspect was "escorted by agents on the three occasions that he was permitted to move, including while he used the bathroom") with O'Neal, 17 F.4th at 240 (observing that agents did not accompany suspect to or from bathroom). When Grubert was allowed to get dressed at the conclusion of the interview, Agent Squire directed that he wear "regular, um, pants, t-shirt, but nothin' else".

Most pertinent to the inquiry, Grubert was never told that

he could leave or dismiss the agents. See O'Neal, 17 F.4th at 239-40 (holding that suspect was not in custody where, inter alia, agents told him that he was "not under arrest" and was "free to go"); United States v. Infante, 701 F.3d 386 (1st Cir. 2012). Rather, on several occasions Agent Squire indicated that his arrest was imminent. For instance, when Grubert stated

> I'm pretty sure when those [handcuffs] go back on, I'm in the back of a cop car, headin' into some – somewhere, you know, which is gonna happen tonight, correct?

Squire affirmed that defendant was "correct" that it would. If any doubt remained, Grubert then stated, "when I'm back in handcuffs, when I'm go -- gettin' registered and gettin' a number", a prediction which neither Squire nor Moynihan disputed or corrected.

That exchange is consistent with the tenor of the conversation, during which, for example, Squire informed Grubert that his life was "gonna be different" going forward, that law enforcement had obtained an incriminating video of him, and that it was "gonna be a while" before Grubert would be living at home again. Those and other similar statements indicated to a reasonable person that the agents were not simply interested in having a conversation with him but rather had made up their minds to arrest him.

While the Court considers the degree of control exercised over Grubert by the agents and the reasonable foreseeability of

-8-

his impending arrest sufficient to resolve the first step of the inquiry, see Stansbury, 511 U.S. at 322, the remaining factors are either in accord or neutral, see Trueber, 238 F.3d at 93. Although only Agents Squire and Moynihan participated substantively in the interview, 15 DHS agents executed the warrant and the interview transcript makes clear that at least some remained in the residence for the duration. See O'Neal, 17 F.4th at 241 (stating that three officers in an interrogation room, with two more outside "was undoubtedly concerning, but not so overwhelming as to establish custody by itself"). Finally, the length of the interview is of minimal consequence. The First Circuit has found both shorter conversations to be custodial and longer conversations to be non-custodial. See United States v. Lanni, 951 F.2d 440, 442 (1st Cir. 1991) (finding that four-hour interrogation was not custodial); Mittel-Carey, 493 F.3d at 40 (finding that interrogation that lasted from one-and-a-half to two hours was custodial). The character of the interrogation, also pertinent to the final factor, has been discussed in detail and need not be recapitulated.

For similar reasons, the interrogation possessed sufficient "inherently coercive pressures" to satisfy the second step. Cruz-Rivera, 14 F.4th at 51. In addition to the circumstances already discussed, the shock of detention may be coercive,

-9-

especially where it occurs in a police-dominated atmosphere, and here, both Grubert and Squire remarked upon the "shock" that the defendant was experiencing. Howes 565 U.S at 511 (citing Miranda, 384 U.S. at 456). Further, although the interrogation was relatively brief, it continued past midnight, and the Court considers the lateness of the hour to impose some mild coercive pressure. Finally, although Squire and Moynihan were not aggressive or overbearing, Grubert repeatedly observed that the agents were his adversaries.

In sum, the conversation between Grubert and Agents Squire and Moynihan was in the nature of interrogation along the "broad spectrum from a speeding ticket to a grilling in the squad room". Cruz-Rivera, 14 F.4th at 51 (quoting United States v. Teemer, 394 F.3d 59, 67 (1st Cir. 2005)). Accordingly, when Grubert made the statements at issue, he was in custody and his Fifth Amendment right against compelled self-incrimination had arisen.

### 2. Invocation of Miranda Rights

Grubert next contends that federal agents did not respect his repeated and unambiguous assertions of his right to remain silent. He insists that he invoked his Miranda rights on three occasions, which are as follows:

1. Grubert avers that he asserted his right to remain silent when told Agent Squire that he was not going to give the

-10-

agents his passwords.

2. He argues that he only agreed to speak to the agents about general computing topics. He adverts to the portion of the transcript in which he stated:

> I just want to be quiet. I have almost nothing to say. Everything that, that we can talk about -- we can talk about the, you know, the little stuff, the -- you know, shootin' the breeze, what we believe about with computing . . . . but beyond that, y'all aren't my friends.

3. Grubert identifies several points at which he informed the agents that he would consider speaking to them but only at a later date.

Grubert submits that, as to each invocation of his right to remain silent, the failure of Agent Squire to stop questioning violated his constitutional rights and warrants suppression.

The government responds that none of those statements rises to an unambiguous invocation of Grubert's right to remain silent but, rather, when read in the context of the conversation, portray an interlocutor keenly aware of those subjects which he was willing to discuss and those which he was not.

The Court agrees. When considered in their context, the second and third statements cited by Grubert indicate that he carefully weighed the benefits and detriments of talking to the agents, conscious of his potential legal jeopardy and of his constitutional rights, and then decided to continue. Neither of those statements nor the conversation as a whole evinces a

person unambiguously asserting his right to remain silent, stymied by overbearing agents or his own inability to articulate his desire "with the discrimination of and Oxford don". Davis, 512 U.S. at 459.  Rather, throughout the interrogation, Grubert probed for certain information from the agents (including what evidence they had against him) and considered the benefits of conversation, both to himself and to children potentially in danger.  Although the defendant may, in retrospect, consider his decision unwise, it was knowing, intelligent and voluntary when made, and a reasonable agent would not have understood him to have asserted his right to remain silent. See Davis, 512 U.S. at 459; United States v. Lara Lara, 440 F. Supp. 3d 64 (D. Mass. 2020).

While the Court considers the second and third statements to be clear examples of that give-and-take, as to the first statement Grubert arguably sought to remove a topic, i.e. his passwords, from the scope of the conversation and it is therefore of a slightly different character. See United States v. Rodriguez, 606 F. Supp. 1363 (D. Mass. 1985) (holding that defendant's refusal to answer certain questions constituted a selective invocation of Miranda rights) (citing Mosley, 423 U.S. at 103-04).  The distinction does not, however, alter the ultimate conclusion.

Even if the Court were to hold that the first statement

-12-

constituted an unambiguous, albeit limited, assertion of Grubert's right to remain silent, the argument that Agent Squire failed scrupulously to honor the invocation is unavailing. See Mosley, 423 U.S. at 104 (holding that law enforcement must "scrupulously honor" an assertion of Miranda rights).  After Grubert informed the agents that he was not giving out his passwords, Agent Squire asked a few innocuous follow-up questions and, when Grubert explained that his decision was a matter of principle and privacy, Squire did not press the issue.

   Later reference by Agent Squire of an "account takeover", which presumably would require Grubert to surrender his passwords, presents a closer question.  The Court concludes, however, that the statement, phrased in the conditional tense and presented as one of several mitigating acts available to Grubert to facilitate cooperation, was not coercive.  It was an expositive response to Grubert's expressed interest in cooperation rather than an attempt to wear down his initial refusal to provide passwords. Lara Lara, 440 F. Supp. 3d at 70 (finding that purpose of the resumed questioning was to "wear the defendant down") (citing United States v. Andrade, 135 F.3d 104, 107 (1st Cir. 1998)).

**ORDER**

For the foregoing reasons, the motion of defendant Neal Grubert to suppress (Docket No. 63) is **DENIED**.

**So ordered.**

　　　　　　　　　　　　　　　　　　/s/ Nathaniel M. Gorton
　　　　　　　　　　　　　　　　　　Nathaniel M. Gorton
　　　　　　　　　　　　　　　　　　United States District Judge

Dated:  May 17, 2022

-14-